S. AMANDA MARSHALL, OSB #95347
United States Attorney
District of Oregon
SEAN B. HOAR, OSB #87254
sean.hoar@usdoj.gov
Assistant United States Attorney
1000 SW 3rd Avenue, Suite 600
Portland, Oregon  97204-2902
Telephone:  (503) 727-1000
Facsimile:  (503) 727-1117
Attorneys for United States of America

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CYRUS ANDREW SULLIVAN,<br><br>Defendant. | Case No. 3:13-CR-00064-HZ<br><br>GOVERNMENT'S MEMORANDUM IN SUPPORT OF DEFENDANT'S DETENTION PENDING TRIAL |

The United States of America, by and through S. Amanda Marshall, United States

Attorney for the District of Oregon, and Assistant United States Attorney Sean B. Hoar, submits

this memorandum to assist the Court in preparation for the detention/release hearing scheduled

for 1:30 p.m. on Monday, March 11, 2013.  As set forth below, the government believes that

defendant Cyrus Andrew Sullivan should be detained pending trial because there are no

conditions or combination of conditions that would reasonably assure the appearance of

defendant and the safety of any other person and the community if he were to be released.   This

memorandum includes a discussion of the relevant parts of 18 U.S.C. § 3142, the federal release

and detention statute, and an explanation of the nature and circumstances of the case, the weight

of the evidence, the criminal history and characteristics of defendant, the nature and seriousness

of the danger posed by him to the community, and his risk of flight.

### Release and Detention Statute

Based upon this Court's authority under 18 U.S.C. § 3142(e)(1), defendant should be

detained pending trial, as he is both a flight risk and a danger to the community.  Section 3142

provides that a court "shall order the detention of the person before trial" if, following a hearing

as required under subsection (f), "the judicial officer finds that no condition . . . will reasonably

assure the appearance of the person and the safety of any other person and the community. . . ."

18 U.S.C. § 3142(e)(1).

Subsection 3142(f)(1)(A) provides that the Court "shall hold a hearing to determine

whether any condition or combination of conditions . . . will reasonably assure the appearance of

such person as required and the safety of any other person and the community (1) upon motion

of the attorney for the Government, in a case that involves (A) a crime of violence. . . ."  In

determining whether there are conditions of release that would reasonably assure the appearance

of defendant and the safety of any other person and the community, subsection 3142(g) requires

the Court to examine the following factors:

> "(1) the nature and circumstances of the offense charged, including whether the offense is
> a crime of violence. . . ; (2) the weight of the evidence against the person;  (3) the history
> and characteristics of the person, including (A) the person's character, physical and
> mental condition, family ties, employment, financial resources, length of residence in the
> community, community ties, past conduct, history relating to drug or alcohol abuse,
> criminal history, and record concerning appearance at court proceedings; and (B)
> whether, at the time of the current offense or arrest, the person was on probation, on
> parole, or on other release pending trial, sentencing, appeal, or completion of sentence for
> an offense under Federal, State, or local law; and (4) the nature and seriousness of the
> danger to any person or the community that would be posed by the person's release."  18
> U.S.C. § 3142(g)(1)–(4).

As set forth below, each of these factors weighs in favor of detaining defendant pending trial. There are no conditions or combination of conditions that would reasonably assure the appearance of him and the safety of any other person and the community if he were to be released.

### A.    The Nature and Circumstances of the Offenses Charged

Subsection 3142(g)(1) directs the Court to take into account the nature and circumstances of the offense charged, including whether the offense is a crime of violence.  A "crime of violence" is defined as "an offense that has an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another. . . ." 18 U.S.C. § 3156(a)(4)(A).

Defendant is charged in an indictment filed on February 13, 2013, with making an extortionate threatening communication in violation of 18 U.S.C. § 875(b).  Section 875(b) provides the following:

> "Whoever, with intent to extort from any person . . . any money or other thing of value . . . transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or *any threat to injure the person of another*, shall be fined under this title or imprisoned not more than twenty years, or both."  (emphasis added).

It is alleged that, with intent to extort money from another person, defendant transmitted an email communication via the Internet containing *a threat to injure another person* if defendant was not paid $10,000.00.  Section 875(b)'s element of threatening to injure the person of another meets the definition of a "crime of violence" under § 3156(a)(4)(A).  Accordingly, the nature of the offense charged, making an extortionate threatening communication, weighs in favor of defendant being detained pending trial.

Defendant is also charged in the indictment with Internet stalking in violation of 18

U.S.C. § 2261A(2)(A).    Section 2261A(2)(A) provides, in relevant part, the following:

> "Whoever . . . with the intent . . . to . . . harass . . . or cause substantial emotional distress to a person in another State . . . uses the mail, any interactive computer service, or any facility of interstate or foreign commerce to engage in a course of conduct that causes substantial emotional distress to that person . . . shall be punished as provided in section 2261(b) of this title."

Section 2261(b)(5) provides that the sentence shall be not more than 5 years.  It is alleged that,

with the intent to cause substantial emotional distress to persons in other States for the purpose of

extorting money from them, defendant caused and facilitated the posting of malicious and

defamatory information on the Internet about those persons, causing substantial emotional

distress to them.  Although the alleged violation of section 2261A(2)(A) may not qualify as a

crime of violence under section 3156, it is nonetheless a crime against other persons, and weighs

in favor of defendant being detained pending trial.

The charges stem from extortionate demands made by defendant to a number of people,

including a threat of death to a woman, A.K., in Oregon.  The demands resulted from an online

business model created by defendant, where malicious content was posted about individuals

online.  The victims of the malicious postings were then told they had to pay fees to have the

information removed.  Defendant's conduct gained so much notoriety that he was the subject of a

national television show hosted by Anderson Cooper in March of 2012.

One of defendant's victims, A.K. from Portland, Oregon, continued to demand that

defendant remove the false and malicious information which was posted about her on the website

www.stdcarriers.com.  When defendant refused to remove the information unless A.K. paid him

$10,000, she decided to fight back.  She aggregated publicly available information about

defendant and posted it online for other people, including defendant's victims, to see.  When

defendant realized what A.K. had done, he threatened to kill her.  That threat spurred the

Portland Police Bureau (PPB) to take action as they believed that defendant would carry out the

threat.

On June 7, 2012, defendant was arrested by the PPB for violations of attempted coercion

and coercion, as defined in Oregon Revised Statute 163.275, and computer crime, as defined in

Oregon Revised Statute 164.377.  On June 8, 2012, Multnomah County Circuit Judge Jean Kerr

Maurer ordered that he be detained on $1,000,000 bail due to the danger he posed to the

community and to his victims and, should he be released, to insure his appearance on the charges

pending in Multnomah County Circuit Court.  On June 11, 2012, Sullivan was indicted by a

Multnomah County grand jury for two counts of coercion, two counts of computer crime, and

one count of identity theft.  He was incarcerated in Multnomah County and held on $1,000,000

bail pending resolution of the matter.  This case was dismissed last month in favor of the related

federal charges.

The threatening extortionate communication to A.K. is related to a report she filed on

January 30, 2012, with PPB stating that defendant had created nine web sites that said A.K. was

giving "oral" favors to Multnomah County Deputy District Attorney Kevin Demer in exchange

for Mr. Demer's prosecution of certain crimes against defendant.  Mr. Demer was at that time

assigned to prosecute defendant in Multnomah County Circuit Court, Case Number C10-03-

43325, for the crimes of criminal mischief in the second degree in violation of ORS 164.354,

disorderly conduct in violation of ORS 166.025, and recklessly endangering another person in

violation of ORS 163.195.  The information posted by defendant regarding A.K. was false.  A.K.

said she contacted Google and they took two of the websites down.  After the websites were

taken down she received an e-mail from defendant stating he was declaring a cyber-war on her.

5 –Government's Memorandum in Support of Defendant's Detention Pending Trial

**The Threatening Extortionate Communication**

On June 4, 2012, A.K. filed another report with PPB stating she believed defendant sent her threatening e-mails.  A.K. forwarded the e-mails to PPB.  The following message was sent on June 4, 2012 at 05:06 a.m. PDT from the email address webmaster@stdcarriers.com belonging to defendant, to an email address @hotmail.com belonging to A.K.:

> "A…,
> You have me angry at you and that is worse than thousands of people,
> especially if you have a daughter like your troll forum post claimed
> because you don't want her to witness what will happen to you if you or
> anyone else publishes that information again (see last email).  You had
> better be very afraid because I am more cold and calculating than you.  I
> am more cold and calculating than you because even though I am not a
> communist, like them I have no regard for human life other than my own.
> Cut your losses before you end up looking back and wishing that you had
> taken my warning seriously."

The following message was sent on June 4, 2012 at 14:46 (2:46 p.m. PDT) from the email address webmaster@stdcarriers.com belonging to defendant, to an email address @hotmail.com belonging to A.K.:

> "You just don't learn your lessons do you?  Now I have no choice but to
> come to your house armed and put an end to you once and for all.  The only
> way you can stop this is by removing your stalker site and paying me
> $10,000.  You don't have a choice."

The following message was sent on June 4, 2012 at 18:19 (6:19 p.m. PDT) from the email address webmaster@stdcarriers.com belonging to defendant, to an email address @hotmail.com belonging to A.K.:

> "You have 24 hours to comply with my demands or I will be paying you a
> visit.  I promise that my visit will not be pleasant for you."

The Internet Protocol addresses from the email header data associated with the first two messages referenced above (the messages sent on June 4, 2012 at 05:06 a.m. PDT and on June 4,

2012 at 2:46 p.m. PDT), show that each message traveled from Oregon to email servers in Europe before returning to the hotmail.com address belonging to A.K.  The hotmail.com address belonging to A.K. is hosted on email servers in the United States.  The email header data associated with the messages show that the email communication traveled in interstate and foreign commerce.

On June 5, 2012, a person identifying himself as defendant left a voice mail on the work telephone of Geoffrey Darling, Chief Investigator with the Oregon Department of Justice, Consumer Protection Section.  Darling had been communicating with A.K. and defendant regarding the websites defendant controlled and information posted on them regarding A.K.  The message was left on June 5, 2012 at 4:57 a.m. and the transcript of the call is as follows:

> "Recorded voice:  To listen to your new messages, press two. To listen to your . . . Hi Geoff, this is Cyrus Sullivan. You probably remember me from running that website. Well, it turns out, um, you were impatient with me, but it turns out that I was right and that (A.K.) is my stalker. I've cc'd you on multiple emails over the past twenty-four or forty-eight hours regarding her activities in which I caught her dead, red-handed, anyway. Uh, um, based on meta data, on data she submitted, she submitted to me anyway.  And uh, well, I'm asking for your help here because (laughs) you're the only person that can prevent her from suffering the ultimate consequences it appears. I have some events in motion that are going to eliminate her as a threat to my company. And those events will kill her if she doesn't stop it. Uh, you know the website that I referred to where her, uh, she basically stalked my family. She changed it. I told her that I was not gonna tolerate her uh, stalking and uh, well, I told her that if she put any more information up she was gonna die. And I put events in motion that will kill her within the next twenty-four hours. You best tell her, tell her to knock it off because I finally got confirmation from (J.G.) that he actually was responsible for what took place but I cannot allow anyone to believe that they can um, you know, attack my family members just to screw up my business. So, unless she is put in handcuffs or she agrees to capitulate within the next twenty-four hours, she is gonna die. And if you screw with me on this with the police or anything, you're gonna be targeted by my new uh, anti-government targeting system, which you know about an alert list slash government, slash law enforcement. Okay? So, you better get on the phone with her and tell her to get in line because I'm on her, on her side because of what he did but if she keeps doing what she's doing, she's gonna be dead within the next twenty-four hours. So I trust you to do the right thing. Thank you. Bye."

### The Internet Stalking

Numerous people have become victims of defendant's stdcarrier.com website.  As an example, over three years ago, on August 11, 2009, E.R. of Burlington, Iowa submitted a complaint to the Oregon Department of Justice (ODOJ) Consumer Complaint Division regarding stdcarriers.com.  E.R. said someone posted information on stdcarriers.com saying she had genital herpes and contracted it through her lesbian lover.  E.R. said the information was not true and could hurt her chances of getting a good job.  At the time she was a full time college student and a single mother.

Another example involved M.B. of Poughkeepsie, New York, who submitted a complaint to the ODOJ Consumer Complaint Division on March 18, 2010, regarding stdcarriers.com.  M.B. said defendant ran a website known as stdcarriers.com and that defendant accused M.B. of being a cyber-terrorist.  The website stdcarriers.com listed M.B.'s name, address, pictures of his house, and a picture of himself stating he was a cyber terrorist and listed a bounty of $7,000 for him. M.B. said defendant posted on numerous sites that he was a terrorist and that there was a manhunt underway for him.  M.B. feared for the safety of his mother and those living at his house and also his future.  If anyone Googled his name and that information came up, it would obviously be difficult for him to get a job.

An additional incident involved C.Z. of Edmonton, Alberta, who submitted an online complaint on April 17, 2012, to the Oregon ODOJ Consumer Complaint Division regarding stdcarriers.com.  C.Z. said information was posted on stdcarriers.com regarding her 16 year old daughter stating that she was 18 and had AIDS and other malicious information.  The stdcarrier.com site contained a link to her daughter's Facebook page.

Defendant took great pride in his business model, and on March 12, 2012, he appeared on a national talk show hosted by Anderson Cooper.  Defendant's stdcarrier.com web site had gained substantial notoriety and was a focus of the show.  A number of viewers who saw the show were so offended at defendant's conduct that they filed complaints about him and his website stdcarrier.com with the ODOJ Consumer Protection Section.

The website stdcarriers.com stated that it provided a collection of information services to online users for the purpose of preventing people from being infected with incurable diseases spread primarily through sexual contact.  In order to report an STD carrier the user must first create an account on the website.  There was a hyperlink on the main page called "Legal" which then highlighted five other hyperlinks.  Clicking on the "Report Removal" hyperlink caused the user to go to stdcarriers.com/legal/recordremoval.aspx.  This page documented a 12 step process by which the user could get their record removed from the site.  At the very bottom of the page was a paragraph called "No Limit List Corporate Advocacy Program (NLLCAP)" which stated the following:

> "STD Carriers is now part of the No Limit List Corporate Advocacy Program (NLLCAP).  NLLCAP offers a variety of options for blocking and removing your information from the web.  It is the ideal solution for those that cannot for whatever reasons complete the 12 step program.  NLLCAP can help you improve your online reputation by optimizing and removing STD Carrier reports from search engines.  Learn more by visiting "No Limit List Corporate Advocacy Program."

The "No Limit List Corporate Advocacy Program" hyperlink went to nolimitlist.com/corporate-advocacy/ and stated the following:

> "The No Limit List Corporate Advocacy Program (NLLCAP) with personal reputation management solutions is the most effective solution for removing negative information from search engines ever offered by a provider of anonymous free speech friendly publishing services, NLLCAP offers a variety of services you need in affordable Bronze, Silver, and Gold Packages."

The regular price for the different packages from NLLCAP ranged from $399.99 to $999.99. There was a hyperlink under the paragraph called "Pitfalls" that stated that NLLCAP was not perfect that it had limits to what it could do to remove information. In general, it stated that NLLCAP did not remove original pages from NoLimitList.com or any partner site. It stated that NLLCAP was primarily a Search Engine Optimization (SEO) service. It stated that SEO takes time and does not work instantly. It further stated that search engine algorithms change frequently and although NLLCAP was run by qualified professionals, they could not guarantee results any more than they could change the algorithms.

The domain nolimitlist.com was registered with INTERNET.BS CORP and had the Domain Name System (DNS) servers as ns1.sullivanbiztech.com and ns2.sullivanbiztech.com. These were the same DNS servers listed for stdcarriers.com which was also registered with INTERNET.BS CORP.

In summary, defendant operated stdcarriers.com for the purpose of creating revenue through nolimitlist.com. It was a business model designed to cause people to be harassed and to incur substantial emotional distress through false and/or malicious postings on stdcarriers.com. This business model was then designed to derive revenue from the victims of the scheme – those who had false and/or malicious information posted about them on stdcarriers.com – by forcing them to pay a fee through nolimitlist.com to have their information removed from the Internet. Both companies were owned and operated by defendant. Ultimately, the whole scheme was also a fraud since, at best, the packages to be purchased from defendant's nolimitlist.com site to remove information from the Internet did nothing to actually remove original content from the Internet.

**Defendant's Arrest, Interview and Detention**

On June 7, 2012, defendant was arrested by PPD detectives for coercion, identity theft and felony computer crime.  He participated in a post-arrest interview which was videotaped.  He was advised of his *Miranda* rights which he acknowledged he understood, and he stated he was willing to talk with the PPB Detectives.  During this interview he said he owned and operated the website stdcarriers.com, nolimitlist and sullivanbiztech.  When asked about the voice mail he left Geoffrey Darling, defendant said he was off his medication at the time and couldn't recall leaving a specific voice mail.  When asked if he had threatened A.K., defendant said, "I don't recall."

On June 7, 2012, during a search of Sullivan's residence, located at 1236 SE 46th Avenue, Portland, Oregon 97215, PPB detectives seized a variety of digital evidence pertaining to the charges of coercion, identity theft and felony computer crime.  The evidence was seized pursuant to a search warrant issued by Multnomah County Circuit Court Judge Jean Kerr Maurer.  This evidence was later seized by the FBI on July 11, 2012 pursuant to a federal search warrant.

As set forth above, on June 7, 2012, defendant was arrested by the PPB for violations of attempted coercion and coercion, and computer crime.  On June 8, 2012, Multnomah County Circuit Judge Jean Kerr Maurer ordered that he be detained on $1,000,000 bail due to the danger he posed to the community and to his victims and, should he be released, to insure his appearance on the charges pending in Multnomah County Circuit Court.  On June 11, 2012, Sullivan was indicted by a Multnomah County grand jury in Multnomah County Circuit Court Case Number 12-06-32556 for two counts of coercion, two counts of computer crime, and one count of identity theft.

On July 6, 2012, a release hearing was held for defendant before Multnomah County Circuit Court Judge Kelly Skye.  One of defendant's victims, A.K., was present during the

hearing.  During the hearing defendant was polite and articulate.  At the end of the hearing, Judge Skye denied defendant's motions to reduce his bail.  After Judge Skye denied defendant's motions, defendant formed his hand into the shape of a gun, pointed it at A.K., and pulled the trigger.  Judge Skye then directed defendant to control himself to which he responded "I am coming after you next, you fucking bitch."  As he was being escorted out of the courtroom by Multnomah County Sheriff's Deputies, defendant was heard yelling what appeared to be profane words at either Judge Skye or A.K.

On January 3, 2013, another release hearing was held for defendant, this time before Multnomah County Circuit Judge Jean Kerr Maurer.  Once again, his release was denied. He was incarcerated in Multnomah County and held on $1,000,000 bail until he was taken into federal custody on the current charges on February 28, 2013.   While he was in custody in Multnomah County, he was tried and convicted of recklessly endangering in Multnomah County Circuit Court, Case Number C10-03-43325.  As referenced above, the Multnomah County Circuit Court case involving coercion, two counts of computer crime, and one count of identity theft was dismissed last month in favor of the current federal charges.

### Penalties and Sentencing Guidelines for Charged Offenses

The penalties for conviction of the charged offenses are significant.  The maximum statutory penalties for making a threatening communication, pursuant 18 U.S.C. §§ 875(b), 3559(a)(3), 3571(b)(3), 3583(b)(2), and 3013(a)(2)(A), are a twenty (20) year term of imprisonment, a $250,000 fine, a three (3) year term of supervised release, and a $100 fee assessment.  The maximum statutory penalties for Internet stalking, pursuant to 18 U.S.C. §§ 2261(b)(5), 2261A(2)(A), 3559(a)(4), 3571(b)(3), 3583(b)(2), and 3013(a)(2)(A), are a five (5)

year term of imprisonment, a $250,000 fine, a three (3) year term of supervised release, and a $100 fee assessment.

Regarding the United States Sentencing Guidelines for the charged offenses, the appropriate sentencing guidelines section is U.S.S.G. § 2A6.2 for the Internet stalking offense alleged in Count 2 because it produces a higher guidelines range than U.S.S.G. § 2B3.2 for the threatening extortionate communication alleged in Count 1 (a total offense level 22 versus a total offense level of 20). Pursuant to U.S.S.G. § 2A6.2(a), the base offense level is 18 because the offense of conviction would be a violation of 18 U.S.C. § 2261A.

Since the offense involved the threatened use of a dangerous weapon and a pattern of activity involving stalking, threatening, and harassing the same victim, the offense level is to be increased four (4) levels pursuant to U.S.S.G. § 2A6.2(b)(1).

As referenced above, defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation or prosecution of the instant offense of conviction, and the obstructive conduct related to defendant's offense of conviction and any relevant conduct, or a closely related offense. As referenced above, during a court appearance on July 5, 2012 in a closely related offense, defendant threatened to kill the victim of the offense and the judge presiding over the hearing. The defendant's offense level should therefore be increased two (2) levels pursuant to U.S.S.G. § 3C1.1. This produces a total offense level of 24.

As set forth below, defendant has a substantial criminal history, and pursuant to U.S.S.G. § 4A1.1(c), his prior convictions appear to merit at least four (4) points. Four (4) points would place him in Criminal History Category III. If the defendant were convicted after a trial, with a total offense level of 24 and a Criminal History Category III, the advisory sentencing guideline

range would be 63 to 78 months imprisonment, or 5.25 to 6.5 years.  While defendant's conduct may merit an upward departure, or an above the guideline sentence, even the guideline sentence is significant and provides substantial motivation to flee prosecution if released from custody.

The nature and circumstances of the charged offenses, making an extortionate threatening communication and Internet stalking, weigh against release of defendant and in favor of him being detained pending trial as both a flight risk and a danger to the community.

### B.      The Weight of the Evidence Against Defendant

Subsection 3142(g)(2) directs the Court to take into account "the weight of the evidence against the person."  As set forth above, the weight of the evidence against defendant is strong. The government has ample evidence to prove all elements of the charges against defendant beyond a reasonable doubt – from the email communication containing the extortionate threat, to the corroborating voicemail communication containing an additional threat, combined with defendant's admissions to ownership of the websites, the corroborating digital evidence, and the public threat to both the victim of the offense and the Multnomah County Circuit Court Judge Skye.  The strong case against defendant, and the likelihood of conviction of both counts with which he is charged, weighs against release of defendant and in favor of him being detained pending trial as both a flight risk and a danger to the community.

### C.      The History and Characteristics of the Person

Subsection 3142(g)(3) directs the Court to take into account a number of things about defendant's character, history and personal circumstances, including in relevant part:

> "the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and  whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or

completion of  sentence for an offense under Federal, State, or local law."  18 U.S.C. §
3142(g)(3)(A) and (B).

The factors set forth in § 3142(g)(3)(A) and (B) weigh against release of defendant in this case.

His **character** is one lacking integrity, empathy, remorse, accountability or responsibility.   His

**mental condition** is one involving struggles with anger, anxiety, obsessive conduct, and anti-

social behavior.   His only **family tie** is that his mother lives in Portland, Oregon, but there is

evidence that she enabled the very criminal conduct with which he is currently charged.  He has

**no employment**, and after leaving his most recent job he retaliated against his former employer,

an Internet company, by "hacking" into several commercial websites owned by the Internet

company, posting offensive material, and sending threatening emails to persons associated with

the Internet Company.   He has minimal **financial resources**, but has shown the ability to create

revenue through illicit online activity.

Perhaps the only factors which may arguably weigh in his favor, involve his **length of

residence in the community** or his **community ties**.  He has lived in Portland, Oregon for a

period of time with his mother.  However, he has continued to violate the law and adversely

impact victims of his conduct, regardless of his residential location or ties to the community.

His **past conduct** is replete with violent and volatile behavior, adversely impacting other

persons.  He is disposed to retaliating against anyone who attempts to hold him accountable for

his criminal and otherwise inappropriate behavior, including fraternity brothers, police officers,

prosecutors and judges.  His personal history shows substantial **alcohol abuse**, as referenced in

his **criminal history** which is detailed below and which shows increasingly violent behavior.  **At

the time of the current offense, defendant was on probation** based on his conviction for

recklessly endangering in Lane County Circuit Court in Case Number 200713499.

## Defendant's Criminal History

Defendant was first convicted on August 29, 2003, in Benton County Circuit Court, in Corvallis, Oregon, Case Number V0300068, on **two counts of criminal mischief in the second degree**. The charges stemmed from an incident while defendant was a student at Oregon State University, in which he shattered a car windshield with a brick, and broke three windows in his fraternity house with various items.  He was intoxicated after drinking beer and smoking marijuana.  He was sentenced to pay a $295 fine.

Following this incident, defendant transferred to Portland State University. He was next convicted on **two counts for assaulting a public safety officer** in Multnomah County Circuit Court in Portland, Oregon, on February 27, 2004, Case Number 0310035094.  These charges resulted from defendant's refusal to leave a facility at Portland State University in which he was publicly drinking.  When asked by another person to pour out the beer because it was against the rules, defendant yelled "Fuck you faggot!" and hit the person in the arm.  The person then began to call the Campus Public Safety Office, when defendant knocked the phone from his hand, causing the phone to hit the floor and break into pieces.  Defendant then threw a beer can at the person and yelled "Fuck you faggot!"  Defendant then left the lobby and when contacted by public safety officers about the incident, he began fighting with them, threatening to kill them. The fight involved a violent struggle with several officers, requiring defendant to be tazed in order to be subdued.  Defendant was sentenced to a term of three years probation.

Defendant was next convicted of **harassment** in Benton County Circuit Court, in Corvallis, Oregon, Case Number CM0520478, on August 25, 2005.  His conviction stemmed from actions against a former fraternity brother.  He used information he obtained from a former fraternity brother's Instant Messenger account to create a forged Criminal Sexual Offender

Release Notification which included the former fraternity brother's photograph and personal information, and alleged that the former fraternity brother was a convicted sex offender. He sent the notification throughout the sorority system at Oregon State University. Defendant was sentenced to serve ten days in jail.

After this conviction, defendant transferred from Portland State University to the University of Oregon in Eugene, Oregon. While a student there, he was involved in a series of incidents stemming from his inappropriate behavior. However, defendant was subsequently charged with reckless endangerment surrounding an alleged bomb making incident. Defendant was convicted in Lane County Circuit Court in Eugene, Oregon, on November 13, 2007, in Case Number 200713499, and was sentenced to an 18-month term of probation.

Last month, defendant was convicted of recklessly endangering another person in Multnomah County Circuit Court Case Number C10-03-43325. The case arose from an incident at a local bar on March 28, 2010. During that incident, the bartender refused to serve defendant because he was highly intoxicated. In response, defendant threw a beer mug at a big screen television and then pulled a knife on bouncers who were attempting to remove him from the premises. Defendant was sentenced to several months in jail. After being sentenced in that case, the Multnomah County District Attorney's Office dismissed Multnomah County Circuit Court Case Number 12-06-32556 in favor of the current federal charges. Defendant had been charged in that case with two counts of coercion, two counts of computer crime, and one count of identity theft.

The factors set forth in § 3142(g)(3)(A) and (B) weigh against release of defendant and in favor of him being detained pending trial as both a flight risk and a danger to the community.

### D.    Danger to Any Person or the Community

Subsection 3142(g)(4) directs the Court to take into account the nature and seriousness of the danger to any person or the community that would be posed by defendant's release.   The facts set forth above demonstrate that defendant is a danger to the community; not only to his past victims, but to anyone who might attempt to hold him accountable for his behavior.  His threatening behavior in the charged offenses, along with his history of harassment and violence, demonstrates that, if released, defendant would pose a direct danger to persons involved in the current offense, and to innumerable future victims.

### Conclusion

Taking into account all the factors set forth in § 3142(g), there are no conditions or combination of conditions that would reasonably assure the safety of the community and the appearance of defendant if he were to be released.  The seriousness of the charges and the sentence he will likely face when convicted provide a substantial incentive to flee, and he has shown he cannot be trusted to comply with authority, even while in custody.  There is every indication that if defendant were released, he would resume his extortionate and threatening behavior.  He should therefore be detained pending trial.

Respectfully submitted this 8th day of March, 2013.

S. AMANDA MARSHALL
United States Attorney

*/s/ Sean B. Hoar*_____
SEAN B. HOAR
Assistant United States Attorney