1              IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF OREGON

3    UNITED STATES OF AMERICA,      )
                                    )
4              Plaintiff,           ) No. 3:13-cr-64-HZ
                                    )
5         vs.                       ) July 18, 2013
                                    )
6    CYRUS ANDREW SULLIVAN,         ) Portland, Oregon
                                    )
7              Defendant.           )
     ------------------------------

8

9

10

11

12

13

14

15                         **SENTENCING**

16                  TRANSCRIPT OF PROCEEDINGS

17         BEFORE THE HONORABLE MARCO A. HERNANDEZ

18            UNITED STATES DISTRICT COURT JUDGE

19

20

21

22

23

24

25

1                         APPEARANCES

2   FOR THE PLAINTIFF:    Sean B. Hoar
                          Assistant United States Attorney
3                         U.S. Attorney's Office
                          1000 S. W. Third Avenue
4                         Suite 600
                          Portland, OR  97204
5
    FOR THE DEFENDANT:    Per C. Olson
6                         Hoevet Boise & Olson, PC
                          1000 S. W. Broadway
7                         Suite 1500
                          Portland, OR  97205
8
    COURT REPORTER:       Nancy M. Walker, CSR, RMR, CRR
9                         United States District Courthouse
                          1000 S. W. Third Avenue, Room 301
10                        Portland, OR  97204
                          (503) 326-8186
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1

2          MR. HOAR:  Good morning, Your Honor.  This is the

3    case of United States versus Cyrus Andrew Sullivan, Case

4    No. 3:13-cr-00064-001-HZ, Sean Hoar with the

5    U.S. Attorney's Office.  The defendant is present, in

6    custody, with his counsel, Per Olson.  Now is the time

7    set for the defendant's sentencing hearing, and I believe

8    both parties are prepared to proceed.

9          I'm not sure how the Court would prefer to

10   proceed, but I wanted you to know that I have a few

11   comments to make about the contents of the defendant's

12   sentencing memo.  I also have one brief witness to call,

13   and I believe the victim may make a brief statement.

14          THE COURT:  What I want to do first is take up

15   the legal issues of where the defendant is on the

16   guidelines.  I've read both sides' memorandums on those

17   issues.

18          If there is anything you want to tell me about

19   that, I'd rather hear about that first.  So go ahead and

20   tell me what you want to tell me about that.

21          MR. HOAR:  I have some rather extensive comments

22   about that, I guess, Your Honor, in that first I'd like

23   to take the multiple threat enhancement.  That would be

24   under Section 2A6.1 subsection (a) -- or, excuse me, the

25   base offense level is 12.  I don't think there is any

dispute about that.  But with regard to the multiple

threat enhancement, under 2A6.1(b)(2)(A), if the offense

involved more than two threats, the offense level is to

be increased by two levels.

The defense makes an argument that each of the

communications don't constitute a threat in the

additional communications and therefore they can't

constitute multiple threats in the context of this case.

But each communication referenced in the presentence

report, as well as those referenced in the Government's

sentencing memo, actually do contain a threat to injure

another person, which a reasonable person would take as a

serious expression of an intention to inflict bodily harm

on that person, which is the definition of a threatening

communication under Section 875(c).

The Government's position is that each of the

communications set forth in its sentencing memorandum --

and I believe that's pages 3 through 5 of the

Government's sentencing memorandum -- actually do contain

a threat which a reasonable person would take as a

serious expression of an intention to inflict bodily

harm.  That would satisfy the legal threshold for

becoming a threat under 875(c) and would also be

consistent with what other courts have held to constitute

a threat in the context of multiple threats for purposes

1  of that sentencing enhancement.

2          And any time you consider a threat, you also have

3  to consider the context in which it is made.  And in this

4  case, when you consider that this defendant had actually

5  gained national notoriety for his malicious use of the

6  Internet and, in doing so, had shown absolutely no

7  remorse for the actions that -- the impact he has had on

8  others nor any empathy for the malicious or defamatory

9  information he had posted or facilitated posting up on

10 the Internet, it was reasonable for the victim of this

11 offense or for Geoff Darling, who is the chief

12 investigator of the Consumer Protection Division of the

13 Oregon Department of Justice to take each message as an

14 independent expression of an intention to inflict bodily

15 harm.

16          The first message, sent on June 4th, 2012,

17 contained the following threat.  It's a portion of the

18 message.  And I apologize to the Court and its staff, but

19 it did contain some foul language.  And in relevant part

20 it provided that "You have been declared an enemy of the

21 company.  If you fuck with me further, I'll report you to

22 the police for stalking.  If the police do nothing, I

23 will do all that is physically necessary to prevent you

24 from being capable of ever stalking anyone else.  You've

25 fucked with the wrong person, and your husband better

1    hope that I never figure out his name or I will own his

2    ass, too."

3            Now, the import of that communication, especially

4    in the context of an individual who has shown absolutely

5    no remorse for anything he's done up to that point on the

6    Internet, has shown no empathy whatsoever for the victims

7    of his malicious and defamatory information on the

8    Internet, one would take that as a serious expression of

9    of an intention to inflict bodily harm.

10           Now, a second message that same day, sent at

11   5:06 a.m., June 4th, 2012, contained the following

12   threat.  Again, this was a portion of the communication:

13   "You have me angry at you, and that is worse than

14   thousands of people, especially if you have a daughter

15   like your troll forum post claimed, because you don't

16   want her to witness what will happen to you if you or

17   anyone else publishes that information again.  You had

18   better be very afraid, because I am more cold and

19   calculating than you."  And then he goes on to say, "I

20   have no regard for human life other than my own."

21           Now again, taken in context, with his notoriety

22   and his previous behavior, one would take that as a

23   serious expression of an intention to inflict bodily

24   harm.

25           And then you have the third message that is the

1  subject of the offense of conviction, where he finally

2  says, "You don't learn your lessons, do you?  Now I have

3  no choice but to come to your house armed and put an end

4  to you once and for all."

5          And then the following morning -- this would be

6  on June 5th -- he left a voice mail message on the

7  telephone of Geoff Darling -- that's G-e-o-f-f

8  D-a-r-l-i-n-g -- who is the chief investigator of the

9  Oregon Department of Justice Consumer Protection Section.

10  And it confirmed what he had said the previous day.  He

11  said, "I have some events in motion that are going to

12  eliminate her as a threat to my company.  And those

13  events will kill her if she doesn't stop it.  I told her

14  that if she put any more information up, she was going to

15  die.  And I put events in motion that will kill her

16  within the next 24 hours."

17          He then threatened Mr. Darling that if he didn't

18  cause Ms. Kelly -- and I use "Ms. Kelly."  It's the

19  victim's maiden name.  It's the name by which the

20  defendant knows her -- that if he didn't stop Ms. Kelly

21  from doing what she had a lawful right to do, that he

22  would target Mr. Darling.

23          And in the defendant's sentencing memo, the

24  defendant claims that that's some sort of a farcical

25  statement.  But the Court needs to consider the fact that

again the defendant had gained national notoriety for his
malicious use of the Internet.  He had actually become
familiar with Geoff Darling because Geoff Darling had
fielded complaints from people literally around the
world, because their personal information had been
maliciously posted on the defendant's websites, and false
and defamatory information about them continued to be
posted on his websites.  And so they had filed complaints
with Mr. Darling, who had initiated communication with
Mr. Sullivan.  So Mr. Darling was very familiar with the
defendant's savvy technological capabilities and knew
that if he said he was going to threaten to do something
to his reputation or something online, that he was
serious.

        And then the statement in the voice mail he left
for Mr. Darling referenced not just the fact that he was
going to target him with his new antigovernment targeting
system, but he referenced the website address of his new
alert list, which targeted law enforcement and those in
government that the defendant did not like.  He
referenced the website address, which was alert list,
slash, government, slash, law enforcement.  He intended
it to be a threat, and Mr. Darling actually considered it
a threat.

        At that point information was being accumulated

1    or aggregated by the Portland Police Bureau, who also

2    took these communications as threats.  They took it

3    seriously, ultimately obtained a warrant for the

4    defendant's arrest and a search warrant, and as soon as

5    they possibly could mobilize themselves went out and in

6    fact arrested the defendant.

7              So the Government's position with regard to that

8    enhancement is that each of those communications

9    independently constituted a threat and otherwise support

10   the multiple threat enhancement.

11             I'm prepared to talk about the obstruction of

12   justice enhancement.

13             THE COURT:  Let's hear from the other side first.

14   We'll go back and forth on each of the topics.

15             Go ahead.

16             MR. OLSON:  Thank you, Your Honor.  Per Olson

17   representing Mr. Sullivan.

18             So to address this first issue of how many

19   threats do we have, our position is we only have one

20   threat, and that is the threat that he pled guilty to.

21             Now, Mr. Hoar does a couple things in his

22   analysis, and I'd like to address each one of those.

23   First of all, he talks about the context; and in the

24   prosecution's view, the context here is these websites

25   that Mr. Sullivan had developed.  That was kind of the

1  background or what formed the background of how these two

2  people came into contact with one another.

3          Well, I don't think Mr. Sullivan was scaring

4  anyone with these websites.  He may have been making a

5  lot of people very upset, but I don't think he was

6  scaring anyone.  And he certainly wasn't scaring Amanda

7  Kelly, the particular complainant in this case.  And so I

8  don't believe it's fair to tie in Mr. Sullivan's conduct

9  with regard to these -- this website that the Government

10  finds offensive and, frankly, a lot of people find

11  offensive.  But this is simply Mr. Sullivan's exercise of

12  his -- of his business, of his constitutional rights to

13  free speech.

14          Now, a lot of people found that offensive, and I

15  can talk more about that.  But the context here -- if we

16  want to talk about the context, the Internet in general,

17  the electronic universe that we now live in contains

18  a lot -- lots of e-mails, lots of statements posted on

19  boards everywhere that could contain, by the Government's

20  definition, threatening statements, but no one treats

21  them as such.

22          Now, when we look at the particular -- again, if

23  we want to talk about context, Mr. Hoar does not mention

24  anything about the prior e-mails and the prior postings

25  from Ms. Kelly.  And that's important because these two

individuals obviously had been engaged in an e-mail
conversation back and forth for several months, leading
up to this threatening e-mail that Mr. Sullivan pled
guilty to.  There was a lot of back and forth.  There
were amicable conversations.  There were conversations
that were less than amicable.

And at one point Ms. Kelly took it upon herself,
in February and March of 2012, anonymously to do some
very threatening things and some very defaming things to
Mr. Sullivan.

And I would point Your Honor only to the e-mail
that she sent posing as an anonymous person in which she
made very specific threatening statements:  "Your
imaginary friends are about to get sodomized with a
thousand baseball bats.  You have informed us how easy it
would be to utterly and completely destroy you.  You're a
dog turd.  Everyone hates you.  You're a joke," and then
very threatening statements:  "We will find you.  We can
find you.  We will find you.  We will find your family,
too.  Wait for this day.  Can you see it coming?  Keep
posting about people, you little bitch.  It's coming.  We
are coming for you.  Ever been to prison, bitch?  It's
going to look like heaven compared to what we are going
to do to you."

And so if we're going to look at -- we can't look

1    at these e-mails that Mr. Sullivan sent in isolation.  He

2    was responding -- by this point, he had discovered that

3    Ms. Kelly was behind this e-mail and the other YouTube

4    postings that we've sent to the Court, and he had

5    discovered that.  And this was the context.  This was the

6    heated nature of their communications up to this point in

7    time.

8         And so he knows he's not communicating with a

9    15-year-old girl.  He knows he's not communicating with a

10   grandmother or a grandfather.  He knows he's

11   communicating with somebody who uses extremely coarse

12   language herself, extremely abusive language, and

13   extremely threatening language.  So if we're going to put

14   it into context, we have to consider that, and this was

15   sort of the nature of their heated communications.

16        Now, when we look at each of these e-mails back

17   and forth, what we see here is that these e-mails are

18   conditioned on "If you do something to me in the future

19   or if you fail to remove this posting about me, I'm going

20   to do something to you, I'm going to take some

21   retaliatory step."

22        Now, it's not clear, except in the one e-mail --

23   well, the clearest e-mail obviously is the one that he

24   pled guilty to, where he says, you know, "I'm going to

25   come armed and put an end to you, once and for all."

1  That's something clearly that he's telling her that he's

2  going to do right now.

3        But when you look at the other ones, it's not

4  clear, number one, whether he is going to engage in an

5  act of violence.  As a matter of fact, in the

6  website -- or in the e-mail, quoted on the top of page 4

7  of the Government's memorandum, he specifically says, "I

8  will not physically hurt you unless you threaten me

9  first."  So he's expressly saying this is -- this is

10  expressly not a threat, because he is saying, "I will not

11  hurt you unless you threaten me first."

12        And the earlier e-mails are, in essence, Your

13  Honor -- if you look at them closely, he's saying, "If

14  you post any information online about me again, if you

15  harass me, I will take some sort of action against you."

16  Now, he's not specific about what that is.  He refers to

17  having no regard for human life other than his own, "Cut

18  your losses."  And that serves as a warning; it doesn't

19  serve as a threat of imminent unconditional violence.

20        So our position, Your Honor -- and then if you

21  look at the -- again, the e-mail or the voice mail

22  message to Geoff Darling, you know, this website that

23  Mr. Sullivan is referring to, you know, that's not a

24  threat of violence.  If anything, he's threatening to put

25  him on some website, but that's not an imminent threat of

1   violence for constitutional purposes or for purposes of

2   this -- of this specific sentencing enhancement.

3          So breaking each one of these -- these alleged

4   threats down, Your Honor, what we really have is only one

5   threat.  And, of course, the Court needs to find three

6   threats for this two-level enhancement to apply.

7          THE COURT:  Thank you.

8          Next?

9          MR. HOAR:  Regarding the obstruction of justice

10  enhancement, application note -- well, under Section

11  3C1.1 of the sentencing guidelines, the application note

12  4 sets forth a number of examples of obstructive conduct

13  to which that section applies.  And it provides that

14  threatening, intimidating, or otherwise unlawfully

15  influencing a witness directly or indirectly or

16  attempting to do so is an example of obstructive conduct

17  to which that section applies.

18         And again, as we discussed already, in the

19  presentence report as well as in the Government's

20  sentencing memorandum there are a number of threats made

21  and other conduct that exhibits obstructive conduct.

22         Now, specifically, the Government's position is

23  that the threat to the chief investigator for the Oregon

24  Department of Justice Consumer Protection Section, that

25  was an intent to threaten or intimidate Geoff Darling.

He was very familiar with the defendant at that time, his technological savvy.  And so even if it wasn't an attempt to physically harm him, it was clearly an attempt to intimidate him, because it's "If you don't do this, your reputation is going to be harmed, because you know what I can do on the Internet, you know what I've done on the Internet, and you know what I'll continue to do on the Internet" essentially.

He said, "If you screw with me on this with the police or anything, you're going to be targeted by my new antigovernment targeting system," and then he goes on to give him the website address.  And, again, you have to consider the context for that.

Now, on July 5th -- I referenced July 6th. Actually, Kevin Demer, who is a deputy district attorney with the Multnomah County District Attorney's Office, is here today, and he would be a very brief witness, perhaps in a few minutes, but he reminds me that that was actually July 5th.

But prior to the adoption of this case for federal prosecution, and while charges were pending for the same conduct in Multnomah County Circuit Court, a release hearing was held before Multnomah County Circuit Judge Kelly Skye.  And the defendant's bail had been set at $1 million because of the danger that he was perceived

1  to have, and he had filed a motion to reduce the bail.

2  The victim of the offense, Ms. Kelly, testified at the

3  hearing.  And at the end of the hearing Judge Skye denied

4  the defendant's motion to reduce his bail.  And he then

5  threatened both the victim by literally locking eyes with

6  her and drawing down on a gun that was fashioned with his

7  finger and then pulling the trigger as if he was going to

8  kill her -- and there can't really be any other import

9  from a gesture like that but that "I'm threatening you.

10 I'm attempting to intimidate you" -- and then he yells at

11 the judge, "I'm coming after you as well," using some

12 foul language.

13        Again, I don't know that there can be any other

14 import from a statement like that, from somebody who

15 specifically yells at a judge who has just ordered -- or

16 made a ruling against him, saying that he's --

17 threatening that he's going to come after her as well.

18 There can be no other import to that but that it's an

19 attempt to intimidate.  Whether or not it actually did

20 cause the judge to reverse her ruling isn't the issue,

21 but was there an attempt to intimidate, and does that

22 conduct otherwise apply for an enhancement under 3C1.1?

23 And the Government's position is it clearly does.

24        THE COURT:  Thank you.

25        MR. OLSON:  On that point, Your Honor, first of

1    all, the voice message to Mr. Darling, if you read it,

2    the import or the force -- the obvious purpose of the

3    voice mail message was to attempt to very improperly

4    enlist Mr. Darling's assistance in getting Amanda Kelly

5    to do what the defendant wanted her to do, or to stop

6    doing what he wanted her to stop doing.  And so the line

7    about "Don't get the police involved" is really very much

8    a passing reference.

9            You know, he's actually telling Mr. Darling in

10   here that he wants him to put her in handcuffs.  So he's

11   actually looking for him to exercise whatever law

12   enforcement authority he has, because Mr. Sullivan is

13   claiming that he's the victim here and he wants him to

14   arrest this woman or to, you know, to get him to do what

15   it is that Mr. Sullivan wants him to do.

16           And, you know, again, the passing reference to

17   this website, again, it's not a threat of violence.  It's

18   just sort of this absurd throw-in.  He's not -- he's not

19   trying to keep this individual from going to the police.

20   This individual is the police.  And I think that's clear.

21   That would have been clear.  To the extent that

22   Mr. Sullivan had a clear mind at the time at all, he's

23   asking this man to put her in handcuffs.  Obviously he

24   has an understanding that he's got some sort of law

25   enforcement capabilities.  So this statement about going

to the police obviously is an absurd one and not intended
to be an intent to keep him away from reporting this to
the authorities.

With regard to the statement in the courtroom,
again, an angry outburst, but Mr. Sullivan had just
listened to Amanda Kelly say a number of things that he
found very upsetting.  And as described in the
Government's memo, up to that point Mr. Sullivan was
composed and polite.  But when he heard those things, he
reacted to it and he made the threatening gesture.  He
doesn't recall what he said to Judge Skye.  And so I just
say that to Your Honor because we don't dispute the
Government's characterization of that, but we're not
really sure what -- he's not really sure what exactly he
said.  He probably did say something like that.

But his intent was not to prevent this from going
forward.  It's on the record.  Obviously it's in full
view of the prosecutor and the judge.  There can
obviously be no real intent -- a realistic intent to stop
Ms. Kelly from coming forward and testifying truthfully.
It was a reaction, an obviously angry, inappropriate
reaction to what she had said.

And the obstruction of justice, you know, it's
got to be in an effort to obstruct or impede the
administration of justice with respect to investigation,

1  prosecution, or sentencing.  And the note 4(A) makes

2  clear that it has to do with unlawfully influencing a

3  witness in their capacity as such.  And so the facts

4  don't fit that circumstance, Your Honor.

5          THE COURT:  Thank you.

6          MR. HOAR:  Your Honor, I should clarify with

7  regard to the statements that were made by the victim at

8  the release hearing, counsel alleges he was just upset

9  with what she said.  What the defendant reacted to is the

10 fact that he didn't get out of custody.  He reacted to

11 both the victim as well as the judge.  So it wasn't as if

12 he was so upset at false or misleading statements,

13 because she made none at that hearing.  According to her

14 and to Deputy District Attorney Kevin Demer, there were

15 no false or misleading statements propounded by the

16 victim at that hearing.

17          And also I should take the opportunity to clarify

18 that referenced in the defendant's sentencing memorandum

19 was what they claimed to be a false 911 call made by the

20 victim.  The victim made no such call, and there's no

21 evidence that she made any such call.  So while someone

22 may have made a false 911 call that caused the police to

23 respond to his home, he had aggravated many, many

24 people -- the evidence is hundreds if not thousands --

25 literally in multiple jurisdictions throughout the United

1   States and in other countries.  And so there are many

2   people who had a motivation to act out against this

3   defendant, but the victim of this offense did not.  She

4   did some things that were ill-advised, but to my

5   knowledge she didn't commit any crimes and certainly did

6   not place any false 911 call.

7          With regard to the final enhancement, Your Honor,

8   the conduct evidencing an intent to carry out a threat,

9   the defendant suggests that there needs to be some --

10  some other physical overt act, perhaps a possession of --

11  the cases that are cited reference the possession of

12  bombs in association with a threat to bomb something or

13  possession of guns with regard to a threat to kill

14  someone.

15         But the cases don't actually hold that.  What

16  they suggest is that the threat itself can be considered,

17  but there needs to be some other conduct involved in

18  order for that enhancement to apply.  And so in this

19  case, you've got the threat itself.  And the tone of the

20  threat, even under the *Newton* case, the *Goynes* case, the

21  *Hines* case and others, can in fact be considered for part

22  of the application for that enhancement.  But it's the

23  other conduct in this case -- the multiple threats prior

24  to that threatening communication and the threats in the

25  follow-up messages after that communication -- that

1   evidence the defendant's intent to carry out that threat.

2   Everybody is so --

3                THE COURT:  So let me interrupt you.  So you have

4   a disagreement about what the law says.  Your other

5   disagreements were disagreements about what the facts

6   meant.

7                MR. HOAR:  Correct.

8                THE COURT:  This disagreement is a disagreement

9   about what the law is.

10                MR. HOAR:  Absolutely.

11                THE COURT:  And the defense is saying, look, you

12   can't use threats as the behavior to justify the

13   enhancement under 2A6.1.  It has to be some other

14   behavior.

15                MR. HOAR:  Right.

16                THE COURT:  But before we get to your

17   interpretation or your perspective on that, do you agree

18   that there is no other behavior other than threats?

19                MR. HOAR:  Yes.

20                THE COURT:  Okay.  Now go ahead.

21                MR. HOAR:  And the people associated with those

22   threats -- the victim of the threat, the target of the

23   voice mail message, Geoff Darling, and then the other

24   people that were brought into the case because of the

25   investigation surrounding it, the Portland Police Bureau,

everybody took that conduct as conduct evidencing an
intent to carry out that threat.  And so they responded
in like kind.  And as soon as the Portland Police Bureau
could mobilize a number of officers and detectives to
respond, they did.  They took it that seriously.

So they clearly saw the multiple communications
and then that specific threat as well as evidence
indicating an intent to carry out that threat.  And then
when the defendant is actually brought into custody, the
Oregon judicial system, the Multnomah County Circuit
Court, also saw that conduct as conduct evidencing an
intent to carry out that threat, which is one of the
reasons his bail was set at $1 million.

And due to his perceived danger to the community,
meaning an intent and possible ability to carry out that
threat or similar threats, he was kept in custody until
at some point this case was adopted for federal
prosecution.  He sits in custody before you today in
large part because of the danger he poses to the
community, because we believe he has evidenced an intent
to carry out his threats, and we don't want anybody
harmed by his behavior.

And so the case law clearly suggests that the
threat itself, the one threat that is the offense of
conviction may not in and of itself support that

 1   six-level enhancement; there needs to be other conduct.

 2   But that conduct doesn't necessarily need to be

 3   possession of a bomb or possession of a gun or travel to

 4   a victim's house in effect.

 5         In one of the cases, in fact, the defendant is

 6   several hundred miles away, but because of the nature and

 7   the tone of the threat and the conduct of what he had in

 8   his possession there hundreds of miles away, and clearly

 9   he physically couldn't have carried out the threat, but

10   it was conduct that evidenced an intent to carry it out,

11   and so the enhancement applied.

12         THE COURT:  Is there a collision between (b)(1)

13   and (b)(2) however, where in (b)(2) you're talking about

14   the multiplicity of threats, and you're using that in

15   order to enhance two levels because there were multiple

16   threats, and then again you're using those same threats

17   to say, well, it was also evidence that he had actually

18   intended to carry it out?

19         MR. HOAR:  Actually, they're a part of that

20   conduct, but there is additional conduct.  There is the

21   statement, for instance, that Mr. Olson referenced that,

22   you know, "I'm going to come to your place.  Unless you

23   threaten me first, I'm not going to do anything.  But

24   it's not going to be pleasant for you."  That wasn't one

25   of the messages I referenced.  That was additional

1   conduct.

2           The voice mail message left on Mr. Darling's

3   voice mailbox, that didn't threaten physical injury to

4   him, so it couldn't be necessarily one of those threats,

5   but -- but it did say, "I'm going to damage your

6   reputation, and you know I can do it if you don't do what

7   I want you to do," basically "If you do something

8   that -- if you don't do something that you otherwise have

9   a lawful right to do, then I'm going to punish you."

10          And it's that conduct that indicates that this

11  guy is willing to do whatever it takes to carry out that

12  threat, that that's conduct in its aggregate form, if you

13  will, the nature and the tone of the threats and the

14  other communications, the other conduct in this case that

15  evidences an intent to carry it out.  That's our

16  position.

17          THE COURT:  Thank you.

18          MR. OLSON:  Thank you, Your Honor.

19          Because this is a six-level increase, it

20  obviously has to be a very significant -- it's a very

21  significant upward departure, and there has to be a

22  really compelling reason for it, given the facts of the

23  case.  And what we heard is that there -- an admission by

24  the Government that there really was no other conduct

25  other than these threats themselves.

 1            Now, I would hope that the Court would agree that

 2   how the police officers react to a threat is not relevant

 3   to whether or not Mr. Sullivan intended to carry it out.

 4   Of course they reacted to it.  The threat of conviction

 5   was a serious threat, and naturally police officers are

 6   going to do their job.  They're going to investigate, and

 7   they arrested Mr. Sullivan.  Of course, they arrested

 8   Mr. Sullivan before they had searched his house.  If they

 9   had searched his house first, they would have found no

10   evidence of an intent to carry out this act, no planning,

11   no maps, no weapons, no recently purchased weapons, no

12   e-mails to cohorts, no plans to go over there, none of

13   that.

14            And so -- and we have more than that.  We

15   actually have a voice mail left with Geoff Darling at a

16   particular point in time saying that something -- if he

17   doesn't take action within 24 hours, Mr. Sullivan is

18   going to do something.  Well, more than 48 hours passes

19   before Mr. Sullivan is arrested.  Nothing happens.

20            And so I would hope also the Court would agree

21   that the seriousness that the Court took this in in

22   setting the bail amount also does not factor into whether

23   Mr. Sullivan actually had the intent to carry out these

24   specific acts.  Obviously there are a lot of factors that

25   go into the setting of bail, including criminal history,

1   and Mr. Sullivan had a criminal history.

2           And so for all the reasons that we laid out in

3   the brief, Your Honor, in greater detail, this is not a

4   situation where Mr. Sullivan evidenced any intent to

5   carry out these threats, such to warrant such a

6   substantial increase in the sentence, doubling or

7   tripling, depending on how you look at it, all the other

8   factors of the sentence, and so we would ask Your Honor

9   not to impose that six-level increase.

10          THE COURT:  Thank you.

11          So that we can get the sentencing guidelines

12  issue completed, does either side have any other comment

13  regarding where he is on the guidelines, other than what

14  I've just heard from you?

15          For the Government?

16          MR. HOAR:  No, Your Honor.

17          THE COURT:  For the defense?

18          MR. OLSON:  No.

19          Well, Your Honor, there are other matters that we

20  addressed in our memo, including two levels down for

21  provocation and diminished capacity, but those I would

22  just rely on my memo, unless Your Honor has any

23  additional questions regarding those.

24          THE COURT:  I do not.

25          All right.  So I want to tell you where we are on

1    the guidelines.  Then we can kind of proceed to

2    everything else.  As regards the first enhancement -- let

3    me back up.  The base offense level is a 12.  Everyone

4    agrees with that.  There is a dispute regarding whether

5    there is evidence of intent to carry out the threat.  In

6    this particular case, as I view the evidence, I am not

7    persuaded that the enhancement 2A6.1(b)(1) applies, and

8    I'm not imposing the six-level enhancement for evidence

9    of intent to carry out the threat.

10           I'm not saying that threats in and of themselves

11   can never be evidence of intent to carry out a threat.  I

12   just don't believe in this case, given the circumstances

13   of what happened and the proximity of the threats to

14   one -- one to the other qualifies for enhancement under

15   these particular circumstances, and I want to emphasize

16   that point.  And when I say "proximity," I'm talking

17   about temporal proximity.

18           Secondly, there is a requested enhancement where

19   there is a dispute regarding whether or not there were

20   more than two threats.  Under 2A6.1(b)(2), I find that

21   there were more than two threats.  The Government has set

22   out, I believe, a mere four of them in their memo.  I

23   find that those are applicable and evidence more than two

24   and that the enhancement of two levels applies.

25           Regarding obstruction of justice, that would be

under Section 3C1.1.  There is dispute about that
enhancement.  The Government pointed really to three
different things:  one, a statement to Geoff Darling;
secondly a statement to the judge, the state court judge
that had ordered the defendant held with a significant
amount of security; and, third, a gesture to the victim
in this case.

I find that each of those qualifies under the
obstruction of justice 3C1.1, and I find that the
enhancement applies.  It is a two-level enhancement.

Everyone agrees there is an adjustment for
acceptance of responsibility.  The defense has asked this
Court to consider additional adjustments.  For purposes
of the sentencing guidelines, I am declining to find
those other adjustments apply.

For purposes, then, of the guidelines, he would
be a 16 before acceptance of responsibility.  And you
have to remind me:  Is it two or three levels when you
get to level 16 for acceptance of responsibility?

MR. HOAR:  If it's 16 or higher, Your Honor, it
would be three levels.

THE COURT:  So he is a level 13 under the total
offense level.  There is an agreement that his criminal
history is 3.  As a 13-3, under the guidelines it is 18
to 24 months.  Am I right about that?

1        MR. HOAR:  Yes, Your Honor.

2        MR. OLSON:  Yes, Your Honor.

3        THE COURT:  I am ready for the rest of your

4   arguments.

5        You have some witnesses you wanted to present?

6        MR. HOAR:  If I could call Kevin Demer with the

7   Multnomah County District Attorney's Office briefly.

8        MR. OLSON:  Your Honor, I'd like to raise an

9   objection at this point.  We just received notice that

10  Mr. Demer was going to be testifying this morning, and

11  just the fact that he's testifying and the subject matter

12  of his testimony causes some issues for the defense,

13  because we're not prepared to cross-examine him.

14       There are memos that were filed with the Court.

15  The Government filed its memorandum back on July 1st.

16  There is no reference in there to the Government calling

17  witnesses at sentencing.  The prosecutor this week,

18  earlier this week, informed me -- when he called me up to

19  ask me if we could switch this to 10:30, I agreed to

20  that.  The representation was made to me that the

21  Government would not be putting on any additional

22  evidence or testimony, so I'm not prepared to

23  cross-examine him.

24       I think there are probably some things that he

25  would testify about that we would readily stipulate to

1  that are in Government's brief.  But to the extent he's

2  offering new material that I don't know about, I would

3  object.

4          My understanding is he's going to testify about

5  two separate court proceedings, which obviously would

6  have been transcribed, so it seems the thing to have done

7  would have been to transcribe those proceedings, under

8  the best evidence rule, if you will.  I'm not sure it's

9  the accurate portrayal of the best evidence rule, but I

10 don't have those transcripts.  I'm not prepared to

11 cross-examine him.

12         THE COURT:  Thank you.

13         MR. HOAR:  Thank you, Your Honor.

14         As I informed Mr. Olson, actually it was the

15 content of his sentencing memo that compels me to call

16 Mr. Demer, and that was the representation by Mr. Olson

17 that during the recklessly endangering trial, that the

18 evidence from the trial testimony was that the defendant

19 didn't intend to throw anything at anybody or hurt

20 anybody.

21         Well, Kevin Demer was the one that tried the

22 case.  He was there when the Court actually issued the

23 ruling.  And he indicated that he couldn't be found

24 guilty of criminal mischief because he didn't intend to

25 damage the TV.  What he did is locked onto the bouncer

1  and tried to hit him with a 16-ounce glass of beer and
2  missed him when he ducked, and it broke the TV.  Now, I
3  asked Mr. Olson if he would stipulate to those facts, and
4  he declined to do so; and I'm not sure that I have any
5  other option other than to correct the record.  But
6  that's all we would offer.
7          THE COURT:  Mr. Olson, what I'm prepared to do is
8  give you an opportunity to talk to a witness who is going
9  to be called.  We can take a recess.  When you're ready,
10 if you want to proceed -- or if you think you need more
11 time, you tell me that, and we can reset this matter in
12 order for you to have more time in order to investigate
13 whether you want to spend more time or not.
14         MR. OLSON:  Okay.
15         THE COURT:  I'll leave that option in your court.
16         MR. OLSON:  All right.
17         THE COURT:  So we'll be in recess.  Let me know
18 when you're ready.
19         (A recess is then taken.)
20         MR. OLSON:  Your Honor, if I could just have a
21 second, just to explain --
22         THE COURT:  Sure.
23         (The defendant and his counsel confer off the
24 record.)
25         MR. OLSON:  We're ready to proceed, Your Honor.

1          THE COURT:  Okay.

2          MR. HOAR:  Thank you, Your Honor.

3          What the parties have agreed to do is I'm going

4    to simply proffer what Mr. Demer would testify to.  If

5    called to testify, Deputy District Attorney Kevin Demer

6    of the Multnomah County District Attorney's Office, who

7    was the trial attorney in the recklessly endangering case

8    referenced on page 19 of the defendant's sentencing memo,

9    he would testify that the trial testimony established

10   that the defendant actually attempted to throw a 16-ounce

11   beer glass at a bouncer, that the bouncer ducked, and the

12   glass mistakenly hit a television set.

13         THE COURT:  Thank you.

14         And both sides have agreed that's how we're going

15   to --

16         MR. OLSON:  That's correct, Your Honor.  We'll

17   just proceed with that proffer of what Mr. Demer would

18   testify to.

19         THE COURT:  Very well.

20         Okay.  Next?

21         MR. HOAR:  Perhaps at this point it might be

22   appropriate for the victim -- the victim may have a brief

23   statement to make to the Court.

24         THE COURT:  Sure.

25         You can stand right there.

1          MS. KELLY:  Hello, Your Honor.  Thanks for

2     listening to me.

3          THE COURT:  Sure.

4          MS. KELLY:  Thank you for being so thorough.  And

5     I just wanted to tell you that I trust you to do the

6     right thing, and I know that you're being really thorough

7     in considering everything.  I watched you at the plea

8     hearing.

9          And I just wanted to add that at that July 5th

10    hearing, the release hearing, July 5th, 2012, after

11    Mr. Sullivan threatened the judge, he had to be dragged

12    out of the courtroom, and he said to me, "Better leave

13    town, bitch."  And, you know, he's probably going to mess

14    with me again, once he gets out.

15         And I just wanted to say thank you for being so

16    thorough, and I appreciate it.

17         THE COURT:  Thank you.

18         MR. HOAR:  Thank you, Your Honor.

19         I'll just make a couple closing comments, if you

20    don't mind.  One thing I'd be remiss in not mentioning is

21    the defendant's continued defense of his use of websites.

22    When he decided to plead guilty to making a threatening

23    communication, I narrowed my focus to specifically deal

24    with that threatening communication.  However, in his

25    sentencing memo, he appears to continue to defend his use

 1    of websites, which are the subject of a count the

 2    Government agreed to dismiss and which were actually used

 3    to hurt and defame other people.  And I would be remiss

 4    if I didn't remind him that a business model that

 5    purposefully involves the posting of malicious and

 6    defamatory information about people in order to get them

 7    to pay someone to have that information removed is

 8    nothing short of extortion and it's not protected by the

 9    First Amendment; and that if he continues to do stuff

10    like that, he will probably find himself in legal

11    problems once again.

12         As we've set forth in our sentencing memorandum,

13    the Government recommends -- the Court has just found

14    that the applicable guideline range is 18 to 24 months.

15    And based on the defendant's prior criminal history,

16    including what appears to be a graduated violence

17    represented in each of those prior convictions, the

18    Government believes that the high end of the sentencing

19    guideline range is appropriate, and we'd recommend that

20    the Court impose a 24-month sentence.

21         The Government also wants to note that the

22    defendant has been in custody for some time, but part of

23    the time in the state system was actually in custody on

24    the recklessly endangering charge.  And so while he

25    should receive credit for time served on this case, I

1   don't believe it's a full 13 months and that the Bureau

2   of Prisons can otherwise calculate that appropriately.

3            THE COURT:  Thank you.

4            MR. OLSON:  Thank you, Your Honor.

5            I meant to introduce at the outset -- there are

6   two individuals in the courtroom.  Patricia Sullivan in

7   the pink sweater, that's the defendant's mother.  Next to

8   her is Connie Ross, who is defendant's stepmother.  I

9   wanted to just -- I meant to introduce them at the

10  outset.  But they're here.  David Sullivan,

11  Mr. Sullivan's father, could not make it today.  But his

12  mother and stepmother are here to show their support.

13           THE COURT:  I read their statements, by the way.

14           MR. OLSON:  Thank you, Your Honor.  I appreciate

15  that.

16           Mr. Sullivan, you know, in looking at all the

17  Section 3553 factors, the nature of the offense and the

18  circumstances of this individual, the offense here is the

19  threat -- the threatening e-mail that he made on

20  June 4th, I believe, 2012.

21           There obviously was a prior history before that,

22  and there is the issue of these websites, particularly

23  the stdcarriers.com website that earned Mr. Sullivan a

24  significant amount of national notoriety.  He appeared on

25  the Anderson Cooper show in March 2012 and was pilloried

1    by Mr. Cooper as well as the audience members and so

2    forth, obviously a very controversial website that

3    Mr. Sullivan maintained.

4          And it became the subject of Count 2 of the

5    original indictment here, where the Government put forth

6    what I would maintain was a very novel theory of

7    prosecution, that by maintaining this website and

8    allowing a forum for other people -- not Mr. Sullivan,

9    but other people -- to post information about other

10   people's STD situation, that in doing that, it was the

11   Government's theory that Mr. Sullivan was engaged in some

12   form of Internet stalking whereby he intentionally set

13   about to cause emotional distress to individuals

14   throughout the country.

15         As Mr. Hoar alluded to, that count is not before

16   the Court, but that background obviously is, and so I do

17   want to bring it to your attention, because there is a

18   risk that Your Honor was offended by those.  Many people

19   are offended by those websites.  But I wanted to stress

20   our position is that that should not be part of the

21   Court's sentencing calculation in arriving at an

22   appropriate sentence in this case.

23         That was the milieu or the environment in which

24   these two individuals came together, but there were a lot

25   of intervening events that led to the ultimate

threatening e-mail, including Ms. Kelly's own conduct.
And Your Honor has declined to go down two levels for the
guideline analysis, but that's still part of this context
for purposes of analyzing the offense conduct, some very
serious threatening statements that she made and very
defamatory, ugly e-mails or YouTube postings that she
made or put out on the Internet.  So that also forms the
context of Mr. Sullivan's behavior.

     Now, we've submitted to the Court under seal a
psychological evaluation, so you have kind of a full
picture of Mr. Sullivan's Asperger's problems and PTSD,
the hazing that he endured as a college student and how
that may have played into not only this incident but some
of the criminal history that we've seen, which largely,
for the most part, is a series of angry outbursts, fueled
by alcohol, nothing pretty about it, but very little if
no evidence of any sort of premeditated harm caused -- to
cause people harm, as opposed to just reacting to
situations that arise in an aggressive manner, an
inappropriate manner.

     Mr. Sullivan, since he's been in custody on these
charges, has been proactive in trying to think -- trying
to do a number of things for himself when he gets out of
custody.  He's gotten onto a correct balance of
medications to sort of control some of these issues.

He's also got himself set up with a case manager through
Multnomah County Developmental Disabilities.  So if he is
released any time soon, he will have a case manager to
assist him in obtaining services or treatment or applying
for SSI, any number of services that they might provide
for somebody with a disability that he has.  So in
addition to his supervised release officer, he'll have
that resource.

And we hope and expect that because of his
disability, he will be able to get SSI income.  He will
be able to get into mental health counseling.  Absolutely
he will get into substance abuse, alcohol counseling.
And we fully expect that those conditions will be quite
rigorous.

And he has a support network here in the
community with his mother, who is not an aider and
abettor.  That's sort of left hanging in the presentence
report.  Ms. Sullivan, I hope, has answered that
question, that she was not aiding him or assisting him in
any way with regard to these websites.  She had
maintained his proprietary interest in these websites
since he's been in custody by paying for the domain
names, but his websites have not been up and running
since he's been in custody.

So all things considered, Your Honor, we're right

1   now with a sentencing guideline range of 18 to 24.  What

2   I would ask the Court to do is conduct a variance

3   downward from that 18 of six months to 12 months.  I

4   think Mr. Hoar is probably correct, he's not going to get

5   credit for all the time that he has served, roughly 13

6   months, because there was a misdemeanor conviction that

7   probably gobbled up some of that time, but he will get

8   hopefully a considerable amount of credit for time served

9   for the last 13 months.

10          Our position, Your Honor, is that a 12-month

11  sentence would adequately serve the purposes of

12  Section 3553, and Mr. Sullivan has been in custody for a

13  long time.  This originally started as a state coercion

14  charge.  I'm not sure exactly what his sentence would be

15  if this were a coercion charge, but I think probably

16  we're in the ballpark of what that would be.  And there

17  were federal charges because of the website and so forth,

18  but we're kind of back to where we started in terms of a

19  threatening statement, a very inappropriate, angry,

20  threatening statement, but not one that was without any

21  sort of context that came before it.

22          So all things considered here, Your Honor, we

23  would ask the Court impose a sentence of 12 months.

24          THE COURT:  I have a question for you.  Have you

25  discussed with your client -- and if you don't want to

1    answer this question, I'm going to ask your client, not

2    about your discussion necessarily, but what the

3    expectation is around the use of computers here on out.

4              MR. OLSON:  Yes, Your Honor.  We've looked at the

5    conditions that are set forth in the presentence report,

6    and I note I lodged somewhat of an objection to that.

7    What I'm -- you know, there's a provision in there that

8    basically talks about getting the approval of the U.S.

9    probation officer.

10             And so at this point I don't want to take the

11   position that Mr. Sullivan should just be able to do

12   whatever he wants on the Internet, on computers.  It

13   sounds like there is built in here -- there's a process

14   of perhaps working with the probation officer, trying to

15   figure out what the right mix is, what the right degree

16   of monitoring is or isn't.

17             And so for that reason, if the Court were to

18   impose these conditions as they're written, with the idea

19   that there will be this sort of back-and-forth idea --

20   now, Mr. Sullivan does not want -- to be perfectly blunt,

21   he does not want an absolute prohibition for accessing

22   computers and the Internet.  His training, his

23   experience, his ability to potentially at all make money

24   in this world is somewhat focused on computer -- his

25   expertise in computer technology, so on and so forth.

1    And so it would place a considerable burden on him to

2    have an absolute restriction.

3            So what I would ask, Your Honor, is let's see if

4    he can work this out with the PO, the probation officer.

5    Upon his release, if there are any concerns that are

6    raised, those can be addressed with the Court.  But -- so

7    that's my position, Your Honor, on that.

8            Was there a specific question?

9            THE COURT:  I was more curious about what his

10   expectation is.

11           We'll talk in a minute.

12           MR. OLSON:  Okay.

13           THE COURT:  Thank you.

14           Mr. Sullivan, one of the things that I neglected

15   to ask you when we first started this morning was whether

16   or not you had had an opportunity to review the

17   presentence report and discuss it with your lawyer.

18           THE DEFENDANT:  Yes, I have.

19           THE COURT:  All right.  And you have a right to

20   make a statement at this time.  What, if anything, do you

21   want to tell me?

22           THE DEFENDANT:  Just that I'm sorry that I

23   lost -- I'm sorry that I lost my cool and said something

24   at all.

25           THE COURT:  This is kind of more than you lost

1    your cool one time.  This is kind of an ongoing thing

2    that took place over a period of time, including probably

3    the last thing that happened is you said some pretty

4    unpleasant things to a judge and the victim as you're

5    walking and being dragged out of the courtroom.

6              THE DEFENDANT:  Yeah.  That wasn't -- I lost my

7    temper.

8              THE COURT:  Well, it looks like that's happened

9    throughout your criminal history.

10             THE DEFENDANT:  Yeah.  I need -- I need to work

11   on that.

12             THE COURT:  Yeah.

13             THE DEFENDANT:  And I don't -- I always end up,

14   like, losing my temper and then having to explain myself

15   later.  And it's -- you know, it gets kind of

16   embarrassing.  But I really didn't mean what I said.  I'm

17   just --

18             THE COURT:  Did you hear the victim when she was

19   talking to me a few moments ago?

20             THE DEFENDANT:  Yeah, I did.

21             THE COURT:  Did you hear her when she was

22   expressing herself, that within that expression was her

23   fear of you?  Did you pick that up?

24             THE DEFENDANT:  I really don't think she actually

25   has any fear of me.

1           THE COURT:  Let me disabuse you of your

2     misunderstanding.  You got her attention.  She's afraid

3     of you.  She really is a victim.  She's terrified of you,

4     and she's terrified about what you may or may not do when

5     all this is over.  In fact, she's convinced you're coming

6     back.

7           What about that?

8           THE DEFENDANT:  Well, I mean, I -- I guess I'm --

9     I can't change her mind, I guess.  But, I mean, most of

10    the stuff I said to her, I'd either been drunk or I had a

11    horrible problem with Aderall.

12          THE COURT:  Well, do you think that makes her

13    feel any better, that you were drunk?  Does that make

14    anybody feel any safer?

15          THE DEFENDANT:  Well, I mean, I guess it's

16    different when you're drunk and --

17          THE COURT:  What about when you exploded at the

18    judge?  Were you drunk?

19          THE DEFENDANT:  No, but I -- I hadn't been taking

20    any medication at all and --

21          THE COURT:  Let me tell you a couple things about

22    victims, okay, because I've dealt with, oh, thousands of

23    victims throughout my career, just like I've dealt with

24    thousands -- literally thousands of people wearing

25    striped shirts and standing in front of me.  I've been

1    doing this a long time.

2            And victims don't care that you have a mental

3    illness, that you struggle with Asperger's.  They don't

4    care that you were drunk.  They don't care that you

5    weren't taking your medicines.  They are just as

6    frightened.  It doesn't matter to them.  You have

7    penetrated a protective layer of security.  You've gotten

8    through.  And it's not going away.  It's like when your

9    house gets burglarized, you feel violated.

10            THE DEFENDANT:  Yeah.  I --

11            THE COURT:  I promise I won't interrupt you, but

12    you don't get to interrupt me.

13            THE DEFENDANT:  Sorry.

14            THE COURT:  When a house gets burglarized, that

15    person who lives in that house feels violated forever.

16    That sense of security is just gone.

17            You violated her sense of security in a much more

18    permanent and profound way.  And I guarantee you, that

19    sense of security that she once had is gone because of

20    what you did.  And you have said nothing this morning to

21    reassure us that her fear isn't well taken.  All you've

22    said to me is "I have reasons for doing what I did."  You

23    said nothing about what you're going to do about making

24    sure it doesn't happen again.

25            THE DEFENDANT:  Focus my time on other things,

1   focus -- focus on work, focus on just rebuilding my life.

2   That's -- ignore her and --

3         THE COURT:  What about the computer?  Let's talk

4   about that for a minute.  I think you have a hard time

5   kind of articulating yourself in front of a judge maybe

6   or in front of other people, so let's move off into

7   something that's a little maybe easier for you to talk

8   about.

9         Do you understand that I'm not going to let you

10  use a computer as a condition of your supervised release?

11  That's not happening without very, very specific controls

12  and observations by somebody else.  And the notion that

13  you're going to continue with your website, it's not

14  happening.

15        Now, I don't want to get into a debate with you

16  about whether that website as legal or not, whether you

17  have a First Amendment right or not, because that's not

18  important to me.  I'll assume you did have a First

19  Amendment right to run the kind of website you did.

20  Let's operate under the assumption that it's completely

21  legal --

22        THE DEFENDANT:  It is.

23        THE COURT:  -- other than the threatening parts

24  of it.  I'll assume you're right about that.  We don't

25  have to debate that.

1          You abused that right.  And once you abuse that

2     right, you now give me the power to control whether or

3     not you will do something that other people can legally

4     do.

5          Let me give you an example.  When someone commits

6     a DUII, does the Court have the authority to prohibit

7     that person, over the age of 21, from consuming alcohol?

8     It's legal, isn't it?  Right?

9          THE DEFENDANT:  Right.

10         THE COURT:  The answer is yes, because they

11    abused that right and privilege, and so the Court now has

12    the ability to take it away.

13         THE DEFENDANT:  I did not abuse the website.

14         THE COURT:  I am taking it away from you.

15         THE DEFENDANT:  I did not abuse the website.

16         THE COURT:  I am taking it away from you.

17         THE DEFENDANT:  I had every right to run that

18    website, and I will run it until the day I die.

19         THE COURT:  Very well.  I will take that into

20    consideration in determining how long I will put you in

21    prison.

22         THE DEFENDANT:  Fine.

23         THE COURT:  Is there anything else you want to

24    tell me?

25         THE DEFENDANT:  No.

```
 1              THE COURT:  I see that you also continue to have
 2    a problem controlling your temper.  Recognize that if I
 3    make it a condition of your supervised release and you
 4    violate that condition, you will be coming back to me
 5    again and again and again.  And if I think that the
 6    appropriate response for you violating conditions of your
 7    supervised release is to continue to incarcerate you, I
 8    will do that.  Do you understand?
 9              THE DEFENDANT:  Yeah.  Yeah, I understand.
10              THE COURT:  Is there anything else you want to
11    say?
12              THE DEFENDANT:  Well, I came here hoping for good
13    judgment and I didn't get it, and I'll never be able to
14    forget that, and --
15              THE COURT:  Be careful.  Because one of the
16    things you don't want to do is turn your comments into a
17    position that might be threatening to a judge.  Your
18    lawyer may want to whisper to you really carefully right
19    now before you go down that path.
20              MR. OLSON:  Thank you, Your Honor.
21              (The defendant and his counsel confer off the
22    record.)
23              MR. OLSON:  If I may, Your Honor --
24              THE COURT:  You may.
25              MR. OLSON:  This is not the first time
```

Mr. Sullivan has said these things.  He knows he's going

to be on supervision.  He knows his computer is going to

be monitored.  He has very strong opinions about his

business operations.  He's got very strong opinions about

the legality of his websites.  But he knows ultimately

about the fact that he's going to be monitored by a

probation officer who is going to come into his home, who

is going to be looking at what he's doing, who is going

to be monitoring, through software or whatever, every

step he takes with regard to this.

And so the tendency with Mr. Sullivan, in my

experience with him, is he says explosive things like he

said right now, but he is also very capable of being

reasoned with when you talk with him.  And this is an

unfortunate way of expressing himself that he doesn't

seem to have the ability to control sometimes.  But

ultimately he knows that he's going to be under

supervision.

And he has a way of expressing himself that gets

him in trouble.  But ultimately he knows that Your Honor

is holding this violation over his head if he does

violate it and that there will be further consequences.

And so I expect that that will happen.

Thank you.

THE COURT:  Thank you.

1    I've considered the advisory guideline range as

2  set forth in the presentence report.  I've also

3  considered 3553(a).  I'm going to select a sentence that

4  addresses the nature and circumstances of the offense and

5  the history and characteristics of the defendant.  I must

6  impose a sentence which reflects, again, the seriousness

7  of the offense, promotes respect for the law and provides

8  just punishment for the offense and also affords adequate

9  deterrence to criminal conduct.  I also must choose a

10  sentence that protects the public from further crimes of

11  the defendant.  In short, I look for a sentence that is

12  sufficient but not longer than necessary to accomplish

13  the goals of 3553(a).

14    I'm committing the defendant to the Bureau of

15  Prisons for confinement for a period of 24 months.  Upon

16  release from confinement, he will serve a three-year term

17  of supervised release, subject to the standard conditions

18  of supervision adopted by this Court and the following

19  special conditions:  The defendant will participate in a

20  mental health treatment program approved by the probation

21  officer.  The defendant will participate in and

22  successfully complete a program for anger management

23  counseling, again as approved by the probation officer.

24    The defendant will not possess or consume alcohol

25  or enter an establishment where alcohol is the primary

1   item for sale.

2           As directed by the probation officer, the

3   defendant will take psychotropic medications if medically

4   approved for the treatment of a mental and/or emotional

5   discard.

6           The defendant will provide the probation officer

7   with a truthful, complete statement or information

8   regarding all computer hardware, software, electronic

9   devices, electronic services, and data storage media to

10  which the defendant has access.

11          The defendant shall submit to search of the

12  defendant's computer for any evidence of a device to

13  which he may have access, including a handheld computing

14  device, any electronic device capable of connecting to

15  any online service or any data storage media, conducted

16  by the U.S. probation officer at a reasonable time and in

17  a reasonable manner based upon a reasonable suspicion of

18  a violation of a condition of supervision.  Failure to

19  submit to a search may be grounds for revocation.

20          The defendant shall warn all individuals that

21  have access to his computer that it is subject to search

22  and/or seizure.

23          The defendant is prohibited from using or

24  possessing any computer and/or directing third parties to

25  do so on his behalf, including any handheld computing

1    device, any electronic device capable of connecting to

2    any online service or any data storage media, without the

3    prior written approval of the probation officer.  This

4    includes but is not limited to computers at public

5    libraries, Internet cafes, or the defendant's place of

6    employment or education.

7          Defendant is prohibited from accessing any online

8    computer service and/or directing third parties to do so

9    on his behalf at any location without the prior written

10   approval of the U.S. probation officer.

11         The defendant will cooperate in the collection of

12   DNA if directed by the probation officer, if required by

13   law.  The defendant will have no contact, direct or

14   indirect, with Amanda, maiden name Kelly, in person, by

15   telephone, through correspondence or a third party.

16         MS. KELLY:  Your Honor, did you see that?

17         MR. HOAR:  Your Honor -- I apologize, Your Honor,

18   but the defendant just turned around and flipped his

19   middle finger at the victim of this offense, and it

20   appears to be a contentious behavior that I'd like to

21   bring to your attention.

22         THE COURT:  Thank you.

23         You need to stop.  Take a deep breath.  Take a

24   drink of water.  Stop.

25         Again, no contact in person, by telephone,

through correspondence or a third party, unless approved
in advance by the probation officer.

No fine is being ordered in this matter as the
defendant has no financial resources nor appreciable
earning ability.  He'll pay the fee assessment in the
amount of $100, due immediately in full.  Monetary
penalties shall be due during the period of imprisonment
as follows:  50 percent of wages earned if the defendant
is participating in a prison industries program, $25 per
quarter if the defendant is not working in a prison
industries program.

The Court notes, Mr. Sullivan, that you have
waived some or all of your appellate rights as part of
the plea agreement.  Such waivers are generally
enforceable.  If you believe the plea agreement allows
you to appeal, you must file a notice within 14 days of
the entry of judgment.  If you are unable to pay the cost
of an appeal, you may apply for leave to appeal in forma
pauperis.  If you so request, the clerk of the court will
prepare and file a notice of appeal in your behalf.

Is there anything else from the Government's
perspective that I have neglected to address?

1          MR. HOAR:  No, Your Honor.

2          THE COURT:  Are there any other findings that you

3     think I need to make as regards the earlier topics which

4     we discussed?

5          MR. HOAR:  I don't believe so, Your Honor.

6          THE COURT:  Is there anything else from the

7     defense perspective?

8          MR. OLSON:  Your Honor, we would ask that the

9     Court recommend Sheridan as the place for incarceration.

10    That goes in the judgment.  The BOP will at least

11    consider it.

12         THE COURT:  I know.  I'm thinking about it.

13         MR. OLSON:  Well, you know, his family is all

14    here, Your Honor.  He probably will be a medium; there's

15    a good chance of that.  And that seems like an

16    appropriate place for him to go.

17         THE COURT:  Thank you.

18         I will go ahead and recommend Sheridan.

19         We are in recess.  Thank you.

20         MR. HOAR:  Thank you, Your Honor.

21         MR. OLSON:  Thank you, Your Honor.

22

23

24         (Proceedings concluded.)

25

--oOo--

1

2

3          I certify, by signing below, that the

4     foregoing is a correct transcript of the record

5     of proceedings in the above-titled cause.  A

6     transcript without an original signature,

7     conformed signature or digitally signed signature

8     is not certified.

9

10

11     /s/ Nancy M. Walker              9/12/13

12     _____    _____
       NANCY M. WALKER, CSR, RMR, CRR        DATE
13     Official Court Reporter
       Oregon CSR No. 90-0091
14

15

16

17

18

19

20

21

22

23

24

25