Cyrus Sullivan
1236 SE 46th
Portland, OR 97215

FILED 6 JUN '16 12:40USDC-ORP

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | 3:13-CR-00064-HZ |
| v | |
| CYRUS ANDREW SULLIVAN | MOTION TO MODIFY CONDITIONS OF RELEASE |

I the Defendant, Cyrus Andrew Sullivan, appearing pro se, hereby moves The Court to modify the conditions of supervised release imposed in this matter. The manner in which conditions 7 and 8 are being enforced is unlawful, the record does not justify employment restrictions, the manner of enforcement is not compliant with 18 U.S.C. 3553 or 3583, and enforcement of the conditions in the event of a violation would not benefit the public. This motion is being filed under 18 U.S.C. 3583(e) and Fed.R.Crim.P. 32.1(c).

**Applicable Law**

18 U.S.C. 3583(e) states that "The court may, after considering the factors set forth in section 3553...(2)...modify...the conditions of supervised release, at any time prior to the expiration or termination of supervised release, pursuant to the provisions of the Federal Rules of Criminal Procedure relating to the modification of probation and the provisions applicable to

the initial setting of the terms and conditions of post-release supervision;" Fed.R.Crim.P. 32.1(c)(1) states that "Before modifying the conditions of probation or supervised release, the court must hold a hearing, at which the person has the right to counsel and an opportunity to make a statement and present any information in mitigation."

### Conditions Enforced Unlawfully

On June 2, 2016 I was informed by my probation officer, Matthew Preuitt, in the presence of his supervisor that I would not be given permission to use computers in any capacity at this time and claimed to have been instructed to do so during ex parte communications with This Court. Such an absolute ban constructively creates conditions contrary to the opinion of the Ninth Circuit Court of Appeals in this case which held that the conditions themselves are lawful only "because the conditions are 'not absolute' but permit access subsequent to approval by Probation", United States v. Sullivan, 588 F.Appx 631 (9th Cir. 2014). Total bans on computer use are unlawful and the Ninth Circuit has never approved a total ban on computer use. See United States v. Goddard, 537 F.3d 1087 (9th Cir. 2008) "Although we and other courts have upheld limitations on the use of computers and the internet without prior approval of the probation office...we have never approved a total ban" holding that such "computer conditions are problematic if broadly construed." Obviously the Ninth Circuit intends for such conditions to be narrowly construed to allow for practicable computer use at home and at work.

By enforcing the conditions as an absolute ban the United States Probation Office ("USPO") has created the exact sort of unlawful release conditions that other courts continue to strike down. When striking down a lifetime total ban the Fifth Circuit acknowledged that "No

circuit court of appeals has ever upheld an absolute, lifetime Internet ban…the absolute ban would completely preclude Duke from meaningfully participating in modern society", United States v. Duke, 14-30559 (5th Cir. 2015), and in United States v. Sealed Juvenile, 781 F.3d at 756-57, that same court concluded that conditions written like mine that require approval from the USPO to access computers or the internet are "not to be construed or enforced in such a manner that the [defendant] would be required to seek prior written approval every single time he must use a computer or access the Internet". That can be interpreted in no other manner than to say that enforcement of such conditions must be limited to the approval of limited access points for extended periods of time. If it is This Court's intention that any condition of my release be treated as a total ban then "to the extent that the condition is intended to be a total ban on Internet use, it sweeps more broadly and imposes a greater deprivation on [my] liberty than is necessary, and thus fails to satisfy the narrow tailoring requirement of 3583(d)(2)." United States v. Holm, 326 F.3d 872 (7th Cir. 2003).

### Sixth Amendment Violations

The conditions as enforced violate my constitutional right to access the courts because that right includes not only the ability to file motions, but the ability to conduct meaningful legal research as well. As This Court is aware I am currently representing myself on appeal challenging This Court's Opinion and Order of January 6, 2016 (9th Cir. No. 16-35270, 16-35292, 16-35293). "The Sixth Amendment…constitutionalizes the right in an adversarial criminal trial [or proceeding] to make a defense…the fullest defense possible", Faretta v. California, 422 U.S. 806 (1975). As a pro se litigant I have the right to the same resources that any attorney would have access to in order to argue the case. See the Supreme Court's decision in Bounds v. Smith, 430 U.S. 817 (1977) "It would verge on incompetence for a lawyer

to file an initial pleading without researching such issues as jurisdiction, venue, studying the exhaustion of remedies, proper parties plaintiff and defendant, and types of relief available. Most importantly, of course, a lawyer must know what the law is in order to determine whether a colorable claim exists, and if so, what facts are necessary to state a cause of action. If a lawyer must perform such preliminary research, it is no less vital for a pro se prisoner." As it stands I had better access to legal material as a prisoner than I now do as a "free" man because case law collections and current legal resources are computerized. As a prisoner I slaved away through substantial legal material using the Bureau of Prisons' ("BOP") LexisNexis software trying to prove the correctness of This Court's opinions regarding the sufficiency of my information and acceptable applications of Fed.R.Crim.P. 7(e) for it (E.C.F. 93 p. 1-7, E.C.F. 96 p. 4-6, 8-12, 16), but could not do so. I have the right to broaden my search to the web and ask legal advice websites for their assistance in finding any legal basis to support This Court's decision so that I may attack it. By denying requests for access to such resources the USPO denied me my right to "adequate law libraries or adequate assistance of persons trained in law", Bounds.

My inability to use computers has also adversely impacted the quality of this motion, especially since I had to ditch at lest two thirds of my legal research so that my paperwork would fit into to lone laundry bag that the staff at USP Victorville gave me when I was released. I didn't think that would be a big deal because under the Sixth Amendment I couldn't think any grounds the USPO might have not let me track down those documents online once released.

**First Amendment Violations**

The stated intention of the USPO when justifying the absolute ban violates my First Amendment right to engage in free speech on the internet. Mr. Preuitt stated that his office was concerned that I would engage in "antagonistic" speech that could provoke another stalker to harass or threaten me, and that "on an off day" I might send such a person a threatening email. To that I say that every person, including a convicted felon on supervised release, has the right to engage in whatever forms of "antagonistic" speech that he so desires as long as such speech falls within the protections of the First Amendment. No court has ever held that my websites are not protected by the First Amendment and This Court specifically stated that they are in fact legal.

Many courts agree that speech described by most as "offensive" or "antagonistic" is the type of speech most in need of protection and The Supreme Court is one such court. See Reno v. American Civil Liberties Union, 560 U.S. 746 (2010) in which they held that the internet "provides relatively unlimited, low cost capacity for communication of all kinds [including "offensive" and "antagonistic" kinds]…Through the use of chat rooms, any person with a phone line can become a town crier with a voice that resonates farther than it could from any soapbox. Through the use of Web pages, mail exploders, and newsgroups, the same individual can become a pamphleteer". In Federal Election Commission v. Wisconsin Right to Life Inc, 551 U.S. 449 (2007) they said that "the First Amendment requires [courts] to err on the side of protecting***speech rather than suppressing it." In Saxe v. State Coll. Area Sch. Dist., 240 F.3d 200 (3d. Cir 2001) the Third Circuit cited the Supreme Court's decision in Brandenburg v. Ohio, 395 U.S. 444 (1969) and Cantwell v. Connecticut, 310 U.S. 296 (1940) when holding that the First Amendment protects "a wide variety of speech that listeners may consider deeply offensive, including statements that impugn another's race or national origin or that denigrate religious beliefs". According to them I have the right to use web pages, mail exploders, and

newsgroups to become a racist pamphleteer if I so choose. Any action by the USPO that prevents me from engaging in any speech in any forum including the internet for any reason violates my right to offend whoever I want to at any time and by any means within the limits of the First Amendment.

I also began writing a book about my experience while in prison and I have a right to use a computer to finish it. I also have a right to use the internet to market it to potential publishers.

### Unjustified Employment Restrictions

Had I been represented by competent counsel at sentencing these conditions would have been challenged as employment restrictions because any "conditions that 'limit[] the terms on which the defendant' may engage in a specified occupation", United States v. Britt, 332 F.3d 1229 (9th Cir. 2003) such as mine with which my "ability to get a job and work in the field for which he was trained would be significantly impacted", United States v. Sunday, 447 Fed. Appx. 885 (10th Cir. 2012) are employment restrictions and subject to the requirements of U.S.S.G. 5F1.5 even though they do not name any specific occupation as prohibited. 5F1.5 states that to prohibit a "defendant from a business, or profession, or limiting the terms on which the defendant may do so" The Court must determine that:

1) a reasonable direct relationship existed between the defendant's occupation, business, or profession and the conduct relevant to the offense of conviction; and (2) imposition of such a restriction is reasonably necessary to protect the public because there is a reason to believe that, absent such restriction, the defendant will continue to engage in unlawful conduct similar to that for which he was convicted.

The USPO does not claim that running my business by itself would result in more threatening emails. They only claim that I would be more likely to encounter "another Amanda Falke", so no evidence is even alleged that absent such a condition I would continue to send threatening emails. The allegation is merely that I may continue to send threatening emails if I encounter "another Amanda Falke". 5F1.5 does not permit employment restrictions based on a belief that the defendant will encounter people that piss him off.

Such restrictions are normally reserved for cases in which the defendant's occupation or business was essential to the offense. By that I mean that absent working in a specific field or running a particular business the defendant could not have committed the crime. It is not enough to simply say that the defendant committed the crime at work while working in a specific field or at a particular company. See United States v. Wittig, 528 F.3d 1280 (10th Cir. 2008) "The offense of conviction was based on Wittig's personal conduct, not his conduct as an executive… the mere fact Wittig engaged in such conduct while employed as an executive does not establish the necessary connection between the conduct and his managerial/executive positions" striking down a prohibition on having "any authority over any business" or "engag[ing] in financial transactions" that was imposed on the grounds that if employed in such a capacity Wittig "would be responsible for a multitude of financial documents" where he might be tempted to make false claims on additional financial documents. The Britt court reached a similar conclusion saying that Britt's history of making false identification cards as part of his drug business did not justify banning him from running a credit repair business to prevent him from engaging in further acts of fraud. Both courts held that employment restrictions can only be imposed "for the minimum time and to the minimum extent necessary to protect the public". If the USPO justifies keeping me from running my business as a means to prevent me from

sending threatening emails then such justification cannot possibly justify prohibiting me from working in my field at all as the minimal employment restriction necessary.

In my case the only relationship between my "crime" and my occupation or business can best be described as a coincidence. I ran a website that angered someone to the point of stalking me in an attempt to coerce me into removing content that I had every right not to remove. I had been the subject of a lot of negative public criticism from all sorts of people including celebrities, politicians, and subjects of articles other people published through my services. At no point have I ever been accused of sending threatening emails to anyone else. It wasn't until someone harassed me, threatened me, and my family that I responded with what I felt was a smaller dose of her own medicine. No one, including The Government at the height of their smearing of me, has ever suggested that had we met some other way and she had done the same things that my response would have been different.

My attorney at the time, Per Olson, compared my restrictions to those that might be imposed on a stock broker convicted of insider trading that prohibit him from trading stocks while on supervised release. I don't believe that to be an appropriate comparison and his use of such an example leaves me puzzled as to why he did not raise a 5F1.5 challenge at sentencing, but such arguments are best left for my 2255 (E.C.F. 70 p. 36-62, E.C.F. 91 p. 10-20, E.C.F. 93 p. 8-10, E.C.F. 96 p. 14-15). A better example would be a stock broker that made a bad trade, lost someone's money, was then relentlessly stalked by a deranged client demanding a refund, and eventually snapped by sending that lunatic a threatening email. Such a case would not justify banning him from trading stocks while on release to avoid losing "another Amanda Falke's" money because he never made any illegal trades. Anger management and monitoring of his email would suffice.

I was personally shocked when reading United States v. Butler, 694 F.3d 1177 (10th Cir. 2012) in which a prohibition on "hunting, fishing, and trapping wildlife" imposed after the defendants "encouraged their clients to violate state hunting laws" by poaching deer during guided tours they led professionally on the grounds that such conditions would "interfere with his occupation" managing "a commercial deer operation." Personally, I thought that a convicted poacher working as a deer hunter would be just as tempted to engage in illegal hunts as the stock broker would be to make illegal trades. Both broke the law to increase profit but the same cannot be said of me. I have suffered more than I ever thought possible due to my email and would never consider sending another one a good decision for my business. If I ever let my personal issues interfere with my professional judgment again I will deserve what I get for it.

I want to wind down this section by emphasizing the importance of Activity Based Costing ("ABC") when evaluating any business including mine. I learned about ABC in business school and it basically involves breaking down costs into activity pools when determining the health of the business. For instance a business that appears unprofitable may appear to some as one that should be shut down. Apply ABC and you may find that the costs making it unprofitable can be traced to activities that can be improved or eliminated, after which the business becomes profitable. Apply ABC to my business and it quickly becomes clear that it was profitable until there was a problem with the email activity. That activity can be further broken down to the threatening email activity and after that is easily removed it becomes profitable again. To say otherwise would have earned me an F on any exam, so I have no problem, as the only person involved in this matter with a business degree, giving The Government and This Court an F in cost analysis.

That is not to say that I never made decisions that I knew would decrease my margin. I knowingly allowed users to edit or delete their work and that work included comments that allowed all sides to be heard. Other websites have been known to abstain from offering such functionality in order to increase reputation management/content removal sales, so I really don't feel like I deserve to be singled out just for requiring proof that a user has abused a service before I remove stuff or for offering to block content from search engines for a reasonable fee if someone for whatever reason cannot get it removed by some other means under the policy.

Finally, I have every right to be self employed as an author and use computers to aid myself in that effort even though I won't be able to finish the book until my fight with The Government is over with. It is difficult to gauge how good it will be when I don't know how it will end, but I can't think of any good reason why it cannot be almost finished before my legal cases are resolved.

## 18 U.S.C. 3553 and 3583 Non-Compliance

The law regarding 18 U.S.C. 3553 and 3583(d)(2) clearly establishes that conditions of release and the enforcement of such conditions must "involve 'no greater deprivation of liberty than is reasonably necessary for the purposes of supervised release' that is, to achieve deterrence, public protection, or offender rehabilitation." United States v. Sales, 476 F.3d 732 (9th Cir. 2007). The Ninth Circuit held that in my case and others like it the conditions as written comply with this section. As written they permit all forms of speech including online speech. They do not say that I cannot use a computer or that a probation officer cannot permit me to use a computer for any lawful activity, so they do not necessarily result in an unreasonable

deprivation of liberty because a probation officer can make sure that they are only enforced to the minimal extent necessary to protect the public from future crimes.

Unfortunately, that is not how they are being enforced in this case. They are being enforced in a manner that the Ninth Circuit and other courts have consistently ruled to be greater than necessary to protect the public as I previously described (p. 1-2 ). For instance if I were a sex offender convicted of a more serious offense, such as child pornography, a probation officer refusing to grant me permission to use a computer to read news articles about children would constitute over broad enforcement under United States v. Riley, 576 F.3d 1046 (9th Cir. 2009). Likewise refusing to permit me to view pornography would also be too broad under United States v. Stoterau, 524 F.3d 988 (9th Cir. 2008). If such words as "pornography" are too broad to describe what types of computer use are allowed than surely the broader term of "computer" is overly broad enforcement that fails to satisfy the statute on a larger scale.

The conditions are not being enforced to the minimum extent necessary to protect the public from threatening emails. As of now I cannot use a computer at all because they say running my business might increase the likelihood that I encounter "another Amanda Falke", and such an encounter might increase the likelihood of me sending a threatening email. None of that justifies restricting me from forms of lawful computer use that does not involve running my websites and it does not justify refusing to permit me to run the sites under a condition restricting email activity. I suggested monitored email use so that I would know that getting away with sending a treating email would be nearly impossible. Such a threat would constitute a new criminal conduct violation under U.S.S.G. 7B1.1 which carries a higher sentencing range than a technical violation, so I don't see how making unauthorized computer use a technical violation

deters threats any more than the more serious new criminal conduct remedies other than by giving the USPO an easier way to monitor me for new criminal conduct.

As it stands the USPO offers no explanation how limiting my ability to fight my legal cases, engage in benign internet use unrelated to my business, work in my field, or look for a job would satisfy any 3553 factors. They also fail to explain how allowing me to run my business would endanger the community because even if I did encounter "another Amanda Falke" they can't show I would be tempted to threaten her any more than a pedophile would be tempted to keep molesting little kids if he were allowed to read a news article about kids or view pornography.

### Enforcement Would Not Serve the Public Interest

If I were to choose to exercise my right to run my business despite these conditions without permission from the USPO I do not believe that it would be in the public's best interest to incarcerate me for it. This may sound extreme, so before the government can accuse me of making threats of any sort I want to say that I am merely presenting The Court with an honest analysis of the situation that would most likely exist in such a scenario.

Whenever you have a system built for one purpose and try to use it for another because it might work there will almost always be problems. In this case the criminal justice system was built to fight crime and not speech by those convicted crimes, so if you start using it to fight lawful activities you may find it largely ineffective at doing so in some cases. This is such a case and if it were not using this system to shut me up would be easy.

When the SilkRoad website was taken down all the FBI needed was the IP address of the server and the ability to use a mutual law enforcement assistance treaty to seize it. That worked because SilkRoad was a criminal enterprise illegal in this country and that one. That is not the case with my websites because like SilkRoad they are hosted abroad, but unlike SilkRoad they are not illegal in this country or that one. Usually to enforce such treaties the alleged crime must constitute an offense in both countries for one to help the other. In the event that any law enforcement agency in the United States were to approach the hosting company with a court order of any sort they would not honor it and their government would not be able to help, especially if the only allegation is that the owner of the site turned it on in violation of supervised release conditions. As a result if I were to be incarcerated for turning them on they would most likely stay up the entire time that I remain behind bars.

The last time I was incarcerated the sites only went down due to treachery and bad luck. I discussed the treachery in my 2255 (E.C.F. 70 p. 82-88) and that could easily be prevented by paying the hosting company enough money to cover their services for the entire time that I am incarcerated or by choosing a similar company that offers automated payment solutions. Either would permit the sites to stay up as long as usage remains within system limits and there are no critical hardware failures. The bad luck was due to my other server suffering a critical hard disk failure in which all data was lost and I was not free to provide backups. There really isn't anything that could have been done about that, but due to auto payments my syndication and data mining sites stayed up for many months following my arrest. During that time period the FBI received some complaints from people that it was impossible to remove syndicated content from those sites. This was because the feature for removing syndicated content required that the source website be live on the web and the source page to be missing. As a result of my

main server going down it was not possible to check source URLs for the 301 or 404 status codes necessary to trigger a removal.

This creates a scenario in which enforcing the violation of any condition of supervision in such a way that incarcerates me for any significant time period would not be a good idea because without me free to police the sites the public would be free to abuse them any way they wish until my release. After my arrest Amanda Falke told Sean Hoar that her circumstances were so much worse that she didn't care whether I was in jail or not as long the sites stayed up. Had I been freed and able to honor my offer to remove content about her things would have improved for her much faster. I have not had a chance to look at any user generated content created since my arrest, but given the amount of media coverage I can only imagine what my users were up to. While in prison I read an interesting Time magazine piece about how people that do content management for Facebook see the worst in people a lot and I knew exactly how they felt. I've seen people do a lot of despicable things and nobody really gets to see or give me credit for what I've removed. If I were to spend 5-11 months in jail for a technical violation as the guidelines recommend I am certain the chaos that would take place in my absence, especially if the press covers my incarceration, would be far worse than any alleged emotional distress that would occur during normal operations.

I would never under any circumstance consider abuse of my services that take place while circumstance beyond my control prevent me from being able to do anything about it my fault. Many would agree with me and there would be serious hurdles for anyone trying to hold me legally liable for failing to remove content that The Court prevents me from being to able to remove. I would blame The Court for choosing to incarcerate me despite being advised of the potential risk. I know many people including The Court would blame me, but to that I would say

that I am just a peaceful non-violent protester openly resisting an overbearing government with the hope that someday it chooses to honor the Constitution. I would use any opportunity that may arise to raise awareness for my cause to voice my opinion as much as possible that when any government fails to honor its own constitution it waives any legitimate claim of right to govern at all and that when faced with such tyranny every citizen has a civic duty not to follow any order issued by such an illegitimate government. If The Government accuses my actions of being a security issue for society in any way I will defend myself by saying that "any society that would give up a little liberty to gain a little security will deserve neither and lose both", Benjamin Franklin.

At this point I would like to express my gratitude to Apple Inc. for fighting the good fight by choosing to protect the rights of their users from the prying eyes of the FBI when they chose not to build a backdoor into the iPhone despite a court order to do so. I've been glad that the data of my users was protected when I caught my case due to my decision to use an offshore host because otherwise I'm sure the FBI would have used it as an excuse to seize all their information. It is unfortunate that the FBI claims to have found another way in because I would have liked to have seen if the FBI has the audacity to arrest Tim Cook or any of his employees for refusing to help them. Sure, they had a court order, but would arresting people that are not criminals just for technically breaking the law for the greater good have helped society, made the FBI look good, or done anything other than cause greater problems? I don't think so and I don't think persecuting me for technical violations that fall within the scope of the First Amendment would either. Often fights for liberties such as these fall on the shoulders of reluctant people that do not live a criminal lifestyle and would rather be doing other things. I consider myself one of those people because before my incarceration other than being an occasional loose cannot that smoked marijuana there was nothing criminal about me and I

would rather be doing many other things than fighting for my rights right now. Unfortunately, I find this fight forced on me and I would have no problem choosing to do what I think would be best for my career and my users even if there is a court order in place saying that I cannot.

I am not afraid of anything This Court can do to me. There was a time when the idea of going to prison scared me and then once at FCI Sheridan the idea of going to a USP scared me. Now that I've been to one of the worst places that the BOP could have sent me I am not the least bit frightened by the thought of going back for 24 months instead of living under this yolk for 35 (E.C.F. 91 p. 16-20, Exhibit 3). In fact I've felt less safe walking down some streets since my release than I did walking the prison yard at USP Victorville. Still there are many things I would rather do than go back.

As much as I would like to turn my sites on today This Court has me in a bit of a bind at the moment. I need to remain free long enough to prosecute my appeal and file a lawsuit against BOP. I discussed how impeding prison conditions are when fighting a case (E.C.F. 98 p. 2-5) and the basis for the lawsuit (E.C.F. 91 Exhibit 4) in my 2255. I am hoping to get this conviction vacated so that I wont need to choose between prison and tolerating the intolerable. I learned the hard way that it is almost impossible to get any lawyer to take a case while an inmate because most law firms do not answer your letters, their phones have prompts that cant accept calls, and most wont take cases on a commission basis from inmates due to the overall poor credibility of inmates in general. Since my release I've spoken to a lawyer that wants to see the surveillance tape, but the internal affairs officer that has it wouldn't give it to me and other people at Victorville seem to have employed every excuse in the book to justify not letting me see it, so I am awaiting a response to a FOIA that I sent to their general counsel. Who knows, maybe they will settle for enough that I can fund a 35 month vacation during which I probably

wouldn't feel like running my business with or without these conditions, but torts take awhile, so does writing a book, and in the meantime I need an income.

**Relief Requested**

I ask that due to the USPO abusing conditions 7 and 8 to the point of constructively creating unlawful release conditions that This Court eliminate them entirely. Obviously the USPO cannot be trusted to enforce them to the minimal extent necessary to satisfy the purposes of supervised release.

Alternatively I request that if This Court will no strike them down entirely that they be modified to permit monitored access by inserting the word "unmonitored" before the word "computer(s)" in condition 7 and "any online" in condition 8. The resulting conditions would read as follows:

7. The defendant is prohibited from using or possessing any <u>unmonitored</u> computer(s) and/or directing third parties to do so on his behalf (including any handheld computing device, any electronic device capable of connecting to any online service, or any data storage media) without the prior written approval of the U.S. Probation Officer. This includes, but is not limited to, computers at public libraries, Internet cafes, or the defendant's place of employment or education.

8. The defendant is prohibited from accessing any <u>unmonitored</u> online computer service and/or directing third parties to do so on his behalf at any location (including employment or education) without the prior written approval of the U.S. Probation Officer.

As part of this I ask that The Court order the USPO to facilitate monitored access to two desktop computers at my home, a smartphone, and any other devices or services in a timely

manner upon request unless they can show cause that I intend to use them for a criminal purpose.

If neither of those work I ask that I at least be able to seek work in my field, use a computer at home for recreational use, and to develop examples of my work for potential employers. This Court said on 11/3/2014 that I should be able to work in the computer industry, but doing so is extremely difficult without examples to show people. This seriously interferes with the exit strategy I had when launching my business which was to develop marketable skills to improve my employability should the business fail. The Village Voice praised one of my sites for its "workmanlike design", Anderson Cooper said that it was so professionally designed that he felt like he was browsing a government registry, and I've found traditional work as a result of my websites. Now I can't show anyone these things to get an edge, but with permission I could build new sites using a lot of the same code as demonstrations. That wouldn't put me at risk of encountering "another Amanda Falke".

I will at a minimum need a computer at home to look for work. Scheduling appointments to use the one at the probation offices is not sufficient and neither is Mr. Preuitt's idea that I could "go door belling".

### Conclusion

The only way to protect my right to free speech in the least restrictive way possible while protecting the public is to strike down or modify my conditions of release. As someone that doesn't live a criminal lifestyle computers are all that stand in the way between prison and being

one of the easiest people in town to supervise. I request that The Court schedule a hearing to address this matter as soon as possible.

Respectfully Submitted,

*[signature] 6/5/2016*

Cyrus Sullivan
Defendant
Pro Se