Ruben L. Iñiguez
**Assistant Federal Public Defender**
**101 SW Main Street, Suite 1700**
**Portland, OR 97204**
**Tel: (503) 326-2123**
**Fax: (503) 326-5524**
**Email: ruben_iniguez@fd.org**

**Attorney for Defendant**


## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **Case No. 3:13-cr-00064-HZ** |
| **Plaintiff,** | **REPLY MEMORANDUM IN SUPPORT** |
| | **OF MOTION TO MODIFY** |
| **vs.** | **CONDITIONS OF SUPERVISED** |
| | **RELEASE** |
| **CYRUS ANDREW SULLIVAN,** | |
| | **[HEARING REQUESTED]** |
| **Defendant.** | |

The defendant, Cyrus Sullivan, through his attorney, Ruben L. Iñiguez, submits

the following reply memorandum in support of his *pro se* Motion to Modify Conditions

of Release. ECF 108. As previously explained in Mr. Sullivan's Response (ECF 116) to

the Government's Motion to Modify Conditions of Release (ECF 114), the parties already

have partially resolved the dispute before the Court. There remains, however, one critical issue to be resolved, namely, whether Mr. Sullivan should be allowed to earn a living by resuming the operation of his former websites with the authorization of the Court. He requests a hearing to address the issue.[1]

## I.    Relevant Factual History.

In 2008, Mr. Sullivan began operating various websites, including stdcarriers.com. *See* STD Carriers' web page, attached hereto as Exhibit A. Although not illegal, the website was controversial because it allowed registered users to post information anonymously about other persons' sexual health, including sexually transmitted diseases or STDs. The site "discouraged the posting of false reports, and at the same time, warned that it would be impossible for it to attest to the truthfulness of any information posted by the users." ECF 51 at 2. The site offered several options for removing false information, including requiring the person who originally posted the information to log in and delete the information, and having the subject of the posting provide medical documentation to show he or she did not in fact have a STD. *Id.*

In August 2009, the former boyfriend of one woman, A. K., "posted derogatory information about her" on stdcarriers.com. Presentence Investigation Report, filed under

---

[1] "Before modifying the conditions of … supervised release, the court must hold a hearing, at which the person has the right to counsel and an opportunity to make a statement and present any information in mitigation." F. R. Cr. P. 32.1(c)(1).

**REPLY MEMORANDUM IN SUPPORT OF MOTION TO MODIFY CONDITIONS OF SUPERVISED RELEASE**

seal as Exhibit B, at ¶ 10.  Two years later, in 2011, after A. K. learned that her ex-boyfriend had posted the information about her on the website, she began taking steps to have it removed.[2]

In early 2012, Mr. Sullivan began offering yet another option for persons to suppress false information from his website.[3]  Mr. Sullivan launched another site, nolimitlist.com, which allowed users to manage and "clean up" their online reputation. The fee charged for the service ranged "between $399.99 and $999.99, depending on the extent to which they wanted their background information sanitized."  Exhibit B at ¶ 10.[4]

During A. K.'s interactions with Mr. Sullivan in early 2012, her conduct was not above reproach.  For example, she placed a 9-1-1 call to police falsely claiming that Mr. Sullivan "was holding hostages at his mother's southeast Portland home."  Exhibit B at ¶ 15.  She also posted his "personal information including his social security number on two online forums [sic]."  *Id*. at ¶ 14.  She "created and posted three videos on YouTube

---

[2] A. K.'s ex-boyfriend was eventually charged in Multnomah County Circuit Court.  He "agreed to remove her information from the website" as part of his plea agreement. Exhibit B at ¶ 11.  He emailed Mr. Sullivan on October 4, 2011, and "began a chain of e-mails between [Mr. Sullivan] and [A. K.], which are sometimes polite, but often rude and directive."  *Id*.

[3] Although the information would still appear on the stdcarriers.com website if someone searched its archives, software written by Mr. Sullivan suppressed the entry from appearing in any web search, including a Google search.

[4] The business model is neither illegal nor unusual.  It is the same as, or very similar to, that used by other websites that allow persons to post negative information about third parties, including pdxmugshots.com, ripoffreport.com, and pissedoffconsumer.com.

REPLY MEMORANDUM IN SUPPORT OF MOTION TO MODIFY CONDITIONS OF SUPERVISED RELEASE

which referred to [Mr. Sullivan] as a loser, a narcissist, and a 'cyber dickwad' among other things." *Id*. at ¶ 15.  One of the numerous emails she sent him "include[d] the statements, 'Your imaginary world is about to collapse.  Your imaginary friends are about to get sodomized with a thousand baseball bats [] . . . You'll never do anything worthwhile . . . You live like a parasite . . . You're a sneaky little turd . . . Nobody loves you . . . You are a loser . . . Everyone hates you.'" *Id*.

On June 4, 2012, after A. K. "confirmed that she had posted derogatory information about him" online, Mr. Sullivan committed the underlying offense.  Exhibit B at ¶ 18.  He sent her a total of three emails that contained threats that same day.  The third e-mail stated, "Now I have no choice, but to come to your house armed and put an end to you once and for all.  The only way that you can stop this is by removing your stalker site and paying me $10,000.  You don't have a choice." *Id*. at ¶ 19.  A. K. reported the threats to police, and Mr. Sullivan was arrested three days later, on June 7, 2012.  *Id*. at ¶ 21.

## II.    Relevant Procedural History.

On June 15, 2012, the federal government filed a Criminal Complaint charging Mr. Sullivan with making threatening communications and internet stalking.  ECF 1.  It subsequently filed an Information that charged him with a single count of making a threatening communication, in violation of 18 U.S.C. § 875(c).  ECF 40.  On April 15, 2013,

pursuant to the terms of a plea agreement, Mr. Sullivan waived his right to Indictment and pleaded guilty to the Information.  ECF 43-46.

On July 18, 2013, this Court sentenced Mr. Sullivan to 24 months' imprisonment and three years' supervised release.  ECF 54.  In addition to the standard conditions of supervision, the Court imposed 11 special conditions.  *Id*. at 3.  Special Conditions 7, 8, and 10 are relevant to this motion.  Those conditions currently state:

> 7. The defendant is prohibited from using or possessing any computer(s) and/or directing third parties to do so on his behalf (including any handheld computing device, any electronic device capable of connecting to any on-line service, or any data storage media) without the prior written approval of the U.S. Probation Officer. This includes, but is not limited to, computers at public libraries, Internet cafes, or the defendant's place of employment or education.

> 8. The defendant is prohibited from accessing any on-line computer service and/or directing third parties to do so on his behalf at any location (including employment or education) without the prior written approval of the U.S. Probation Officer.

> * * *

> 10. The defendant shall have no contact with A. K. (the victim identified in the pre-sentence report), in person, by telephone, through correspondence or a third party unless approved in advance by the probation officer.

*Id*.[5]

Mr. Sullivan directly appealed the Court's imposition of Special Conditions 7 and 8.  *See United States v. Sullivan*, 588 F. App'x 631 (9th Cir. 2014) (unpublished mem.).  The Ninth Circuit denied the appeal on the ground that his written waiver of appeal was

---

[5] At the time of sentencing, Mr. Sullivan objected to the imposition of Special Conditions 7 and 8.  *See* ECF 51 at 20.

**REPLY MEMORANDUM IN SUPPORT OF MOTION TO MODIFY CONDITIONS OF SUPERVISED RELEASE**

"unambiguous and precludes an appeal of the challenged terms of supervised release." *Id*.

On May 9, 2016, Mr. Sullivan commenced his three-year term of supervised release. On June 10, he filed a *pro se* Motion to Modify Conditions of Release. ECF 108. By way of the motion, Mr. Sullivan initially sought to modify, if not eliminate, Special Conditions 7 and 8. He sought to modify Special Condition 7 to permit him to use computers and electronic devices, subject to monitoring by the U.S. Probation Office. *Id.* at 17. He similarly sought to modify Special Condition 8 to allow him to access "online computer service[s]." *Id.* In lay terms, Mr. Sullivan sought the Court's authorization to use computers and access the Internet and, more specifically, to operate the websites he had managed for four years before his arrest—again, subject to monitoring by the U.S. Probation Office. *Id*.

## III.    The Parties' Partial Resolution.

The Ninth Circuit recently held that a total ban on Internet use is overbroad and unwarranted, and that "a proviso for probation-officer approval does not cure the problem." *United States v. LaCoste*, 821 F.3d 1187, 1192 (9th Cir. 2016) (citing *United States v. Sales*, 476 F.3d 732, 737 (9th Cir. 2007)). In light of the appellate court's ruling in *LaCoste*, the government now concedes that "an unqualified and total ban on computer usage is improper." *See* ECF 115 at 2. As a result, the parties have agreed to jointly recommend

that the Court replace the language of Special Condition 7 with the following new language so that it will now read:

> 7.    The defendant shall participate in the U. S. Probation Office's computer monitoring program, which may include installation of software or hardware on the defendant's computer that allows random or periodic monitoring of defendant's computer use, periodic inspection of defendant's computer (including retrieval, copying, and review of its electronic contents) to determine defendant's compliance with the monitoring program and conditions of supervision. Defendant's computer use and his participation in this monitoring program extends to those computers, software programs, smartphones, cellular phones, tablets and related devices capable of connecting to any on-line service, or data storage media allowing access to electronic services and the Internet.

ECF 115 at 3.

The parties also have agreed to modify Special Condition 10 to make clear that Mr. Sullivan shall have no contact with A. K. by email, text, or any other electronic means. The parties jointly recommend that the Court amend the language of Special Condition 10 so that it will now read:

> 10.    The defendant shall have no contact with A. K. (the victim identified in the presentence report), by email, text, or any other electronic means, in person, by telephone, through correspondence or a third party unless approved in advance by the Probation Officer.[6]

ECF 115 at 4.

---

[6] If the Court prefers, Mr. Sullivan does not oppose an absolute ban on all contact with A.K. He does not oppose the deletion of the phrase "unless approved in advance by the Probation Officer."

**Page 7**    REPLY MEMORANDUM IN SUPPORT OF MOTION TO MODIFY CONDITIONS OF SUPERVISED RELEASE

IV.    **The Parties' Disagreement.**

The parties have not been able to reach an agreement on an appropriate modification to Special Condition 8.  Mr. Sullivan recommends that the Court amend Special Condition 8 in the least restrictive manner possible, namely, by inserting the word "unmonitored" so that it will now read:

> 8.    The defendant is prohibited from accessing any *unmonitored* online computer service and/or directing third parties to do so on his behalf at any location (including employment or education) without the prior written approval of the U.S. Probation Officer.

ECF at 4.

The government, by contrast, proposes that the language of Special Condition 8 be deleted in its entirety and replaced with the following new language which would prohibit Mr. Sullivan from operating stdcarriers.com or any similar websites:

> Defendant shall not own or operate, directly or indirectly, any former website, including "STDCarriers.com," "nolimitlist.com," or any similar website that offers reputation management services or otherwise involves the removal of names, titles, identities, phone numbers, email addresses, or any other personal information from such websites or other publications, whether or not payment of money is required, without the prior written approval of the Probation Officer.

ECF 115 at 4.

The government also proposes that the Court add yet another Special Condition, number 12, to require that Mr. Sullivan's "employment shall be subject to approval by the Probation Officer."  *Id.*

Mr. Sullivan opposes the government's requests to delete and replace the language of Special Condition 8, and to add a new Special Condition 12.

**V.      Jurisdiction to Amend Conditions of Supervised Release.**

The Court has jurisdiction to modify the terms and conditions of Mr. Sullivan's supervised release under 18 U.S.C. § 3583(e).

**VI.      The Law Relative to Special Conditions of Supervised Release.**

District courts "enjoy broad discretion" in imposing conditions of supervised release. *Lacoste*, 821 F.3d at 1190. However, any condition imposed must be reasonably related to the nature and circumstances of the offense, the history and characteristics of the defendant, or the sentencing-related goals of deterrence, public protection, or rehabilitation. *Id.* at 1190–91 (citations omitted); *see also* 18 U.S.C. § 3583(d). Every special condition "must be consistent with the Sentencing Commission's policy statements." *LaCoste*, 821 F.3d at 1191. Finally, "the condition may involve 'no greater deprivation of liberty than is reasonably necessary' to serve the goals of supervised release." *Id.* (quoting 18 U.S.C. § 3583(d)(2)).

The U.S. Sentencing Guidelines require that the Court find not only "a reasonably direct relationship" between Mr. Sullivan's prior occupation and the conduct relevant to the offense of conviction, but also that imposing a certain occupational restriction is "reasonably necessary to protect the public because there is reason to believe that, absent

such restriction, the defendant will continue to engage in unlawful conduct similar to that for which the defendant was convicted." U.S.S.G. § 5F1.5(a). The Court must impose any "condition for the minimum time and to the minimum extent necessary to protect the public." U.S.S.G. § 5F1.5(b).

## VII.  The Court Should Not Modify Special Condition 8 To Ban Mr. Sullivan From Operating His Former Websites.

### A.     A Total Ban on stdcarriers.com Implicates Heightened Scrutiny.

From 2008 to 2012, Mr. Sullivan made his living by operating various websites, including stdcarriers.com and an associated reputation management web business. He earned "approximately $2,500 per month from that business in 2008 and 2009." Exhibit B at ¶ 65.

Because the government's proposed amendment to Special Condition 8 would, like the current version, totally ban Mr. Sullivan from operating his web business, it constitutes an "occupational restriction." *United States v. Stoterau*, 524 F.3d 988, 1009 (9th Cir. 2008). The Ninth Circuit has interpreted the Sentencing Guidelines as requiring "heightened scrutiny" of occupational restrictions. *Id.* at 1009. *See also United States v. Paul*, 274 F.3d 155, 171 n. 18 (5th Cir. 2001) (where a defendant's primary means of supporting himself are involved, a higher level of scrutiny for occupational restrictions applies under § 5F1.5). Moreover, because the government's proposed modification of Special Condition 8 would restrict Mr. Sullivan's First Amendment right to free speech,

it is subject to "special scrutiny," *United States v. Lawson*, 670 F.2d 923, 930 (10th Cir. 1982),

and must be "reviewed carefully" on appeal.  *United States v. Terrigno*, 838 F.2d 371, 374

(9th Cir. 1988).[7]

### B.    A Total Ban On Mr. Sullivan's Operation Of His Former Websites Is Not Reasonably Related To His Offense Of Conviction.

Against the backdrop of heightened scrutiny, it is critical to focus narrowly and

directly on the nature of the offense of conviction, namely, making a threatening

communication.  *See United States v. Britt*, 332 F.3d 1229, 1233 (9th Cir. 2003) ("§ 5F1.5

limits occupational restrictions to *those based on the offense of conviction*." (emphasis

added)).

Mr. Sullivan was convicted of a single count of making a threatening

communication by email.  *See* ECF 40 ("defendant . . .  knowingly transmitted . . . a

communication containing a threat to injure the person of another."); ECF 46 at ¶ 24 ("I

knowingly and intentionally transmitted . . . an email communication containing a threat

to injure the person of another").  There is no mention of stdcarriers.com or any other

---

[7] At the sentencing hearing, the Court assumed, without deciding, that Mr. Sullivan's website was legal, and he had a First Amendment right to operate it.  *See* ECF 64 (Sentencing Transcript) at 45:15-21 ("Now, I don't want to get into a debate with you about whether that website [w]as legal or not, whether you have a First Amendment right or not, because that's not important to me.  I'll assume you did have a First Amendment right to run the kind of website you did.  Let's operate under the assumption that it's completely legal --").

website in the Information, Plea Agreement, Plea Petition, or Judgment. *See* ECF 40, 45, 46, and 54. In fact, although the parties' agreement contains a lengthy recitation of those "Facts/Relevant Conduct" they agreed could be proven beyond a reasonable doubt, stdcarriers.com is not discussed. Why? Because Mr. Sullivan's operation of the site had little, if anything, to do with the offense. The only connection between his management of the website and the underlying offense stems from the fact that the site served to bring the two disputing parties together. The site otherwise had nothing to do with the crime. The connection between the offense and the website was tangential at best.[8]

While the websites that Mr. Sullivan previously operated may be viewed as unseemly or distasteful by some, they were—at most—tangentially related to the offense of conviction. During the four years he operated stdcarriers.com (2008 to 2012), millions of persons visited, posted, and otherwise used the site. During that period, no similarly hostile interaction developed with anyone who posted information on the site, or whose information was posted there. In other words, the offense was not a regular occurrence

---

[8] The only other tie between the offense and the stdcarriers.com website is the fact that Mr. Sullivan used the email address webmaster@stdcarriers.com to send the threatening communication to A.K. *See* ECF 45 at ¶ 5. However, that tenuous connection is insufficient to justify the government's proposed occupational restriction. A less restrictive means of preventing any possible reoccurrence of a threatening email is available, namely, authorizing the probation office to monitor Mr. Sullivan's use of email, as he proposes the Court do.

**Page 12    REPLY MEMORANDUM IN SUPPORT OF MOTION TO MODIFY CONDITIONS OF SUPERVISED RELEASE**

in his day-to-day operation of the website.  To ban Mr. Sullivan from resuming his business for the next three years would be akin to "cutting off his nose to spite his face."

The government's primary objective is to prevent Mr. Sullivan from making another threat against A. K., or another person similar to her, in the future.  Mr. Sullivan understands that.  It is for that reason that he is voluntarily agreeing that the Probation Office be allowed to monitor of all of his computer, Internet, and website activities in order to achieve that objective.

Banning Mr. Sullivan from operating stdcarriers.com, or any similar website,[9] would be an improper occupational restriction that is not directly related to the underlying offense of making a threatening communication.  *See United States v. Erwin*, 299 F.3d 1230 (10th Cir. 2002) (reversing occupational restriction not related to the offense of conviction); *United States v. Doe*, 79 F.3d 1309, 1322 (2d Cir. 1996) (same).

The defendant in *Erwin*, a felon, was arrested for illegal commercial fishing.  299 F.3d at 12331-32.  He was also found with ammunition, a violation of 18 U.S.C. § 922(g).  *Id* at 1231.  The district court imposed an occupational restriction banning him from commercial fishing while on supervised release.  *Id.*  On appeal, the Tenth Circuit ruled that "[b]efore such a prohibition is imposed, the district court is required to determine

---

[9] Mr. Sullivan seeks the Court's authorization to operate his other websites, including nolimitlist.com and cyberbullyingreport.com, which he operated in conjunction with stdcarriers.com.

REPLY MEMORANDUM IN SUPPORT OF MOTION TO MODIFY CONDITIONS OF SUPERVISED RELEASE

that without the prohibition [the defendant] will continue to engage in criminal conduct similar to that for which he was convicted[.]"  *Erwin*, 299 F.3d at 1232.  The court ultimately concluded that "the district court abused its discretion in imposing the prohibition on commercial fishing" because it "did not demonstrate that *any* relationship existed between commercial fishing and unlawful conduct similar to possession of ammunition."  *Id*. at 1233 (emphasis in original).  As it explained, "[t]he plain wording of the guideline [U.S.S.G. § 5F1.5] dictates that there be a connection between an occupational restriction and the conduct for which the defendant was convicted." *Id* at 1232.

A similar situation arose in *United States v. Peterson,* 248 F.3d 79 (2d Cir. 2001) (per curiam).  And the result was the same.  The defendant there was convicted of "bank larceny based on payments made with bad checks."  *Id*. at 84.  However, based on a prior state conviction for incest and his accessing legal pornography on his home computers while his case was pending, the district court imposed "broad restrictions" on Peterson's computer use and Internet access while on probation.  *Id*. at 82-83.  Observing that the defendant had "consistently worked in computer-related jobs and . . . operated his own computer business," the Second Circuit found "the special condition . . . imposed by the District Court constituted an occupational restriction."  *Id*. at 83-84.  Relying on § 5F1.5, it then struck down the condition as overly broad.  *Id* at 84.

Prohibiting Mr. Sullivan from operating his former websites would be no different from the situations in *Erwin*, *Peterson*, and *United States v. Britt*, 332 F.3d 1229 (9th Cir. 2003). Like the Second and Tenth Circuits, the Ninth Circuit in *Britt* overturned a district court's imposition of special conditions that required the defendant, convicted of conspiracy to distribute methamphetamine, to disclose to potential business customers his prior convictions for financial crimes. *Id* at 1230. Rejecting first the government's argument that the conditions were "not occupational restrictions," the court held that the notification requirements "must comply with § 5F1.5." *Id*. at 1232 (citing *Peterson*, 248 F.3d at 85-86; *Doe*, 79 F.3d at 1322-23). After noting that Britt's conviction was for a drug crime, the Ninth Circuit then stated, "[t]here is no apparent relationship between that conviction and the 'credit repair' business in which he is currently engaged [and] [t]he government does not suggest that his occupation will allow him to resume participation in the drug trade." 332 F.3d at 1232-33. "There is no reason to believe that allowing him to run this business would allow Britt to 'continue to engage in unlawful conduct similar to that for which [he] was convicted.'" *Id*. at 1233 (quoting U.S.S.G. § 5F1.5(a)(2)). In the end, the court of appeals concluded "there was no reasonably direct relationship between Britt's occupation and the conduct relevant to the offense of conviction." *Id*. at n.2.

Despite this case law, the government claims that a special condition requiring "probation officer approval for employment is an acceptable condition of supervised release in a case such as presented here." ECF 115 at 5. It cites a single case, *United States*

*v. Goddard*, 537 F.3d 1087 (9th Cir. 2008), in support of its assertion. *Id*. Its argument lacks merit. *Goddard* is plainly distinguishable from the case at bar.

First, unlike Mr. Sullivan, the defendant in *Goddard* not only was convicted of possession of child pornography, but he also "had a prior conviction for sexual battery involving a touching of a 13-year-old girl on her way to school." 537 F.3d at 1089. Second, the employment restrictions that Goddard challenged related directly to both his conviction and his criminal history. The conditions prohibited him from "working in an environment that causes regular contract with [minors], . . . working for a company whose principle product involves [pornography], and . . . require[d] [his] employment to be approved by the probation officer." *Id*. at 1091 (footnotes omitted). Third, and perhaps most importantly, the conditions did "not prevent Goddard from doing *his past work*[.]" *Id*. at 1091-92 (emphasis added).[10] In light of Goddard's conviction and prior history, it is hardly surprising that the narrowly tailored employment restrictions were upheld on appeal.

Because Mr. Sullivan's offense of conviction was sending a threatening communication by email, and his computer, Internet, and website activities may be

---

[10] The Ninth Circuit held that "heightened scrutiny" was "not triggered" in *Goddard* because the employment restrictions at issue there did "not restrict Goddard's ability to work as a warehouse foreman, his occupation before he was convicted." 537 F.3d at 1092 (citation omitted). The government here, by contrast, is specifically proposing that the Court restrict Mr. Sullivan "from doing his past work." *Id*. at 1091. Heightened scrutiny is thus triggered.

Page 16    **REPLY MEMORANDUM IN SUPPORT OF MOTION TO MODIFY CONDITIONS OF SUPERVISED RELEASE**

subject to unlimited monitoring by the Probation Office, there is no viable justification for restricting his occupation by barring him from resuming the operation of his former websites.

### C. The Government's Proposed Special Condition 8 Would Constitute a Greater Deprivation of Liberty than Necessary.

In addition to being unrelated to the offense of conviction, prohibiting Mr. Sullivan from operating stdcarriers.com, or any similar website, would amount to an unnecessary deprivation of his liberty. Mr. Sullivan has consented to the monitoring of all of his computer and Internet activities. As a result, the Probation Office will be in a position to closely monitor how he conducts his web business, detect immediately any suspicious or unusual activity, and prevent and punish any inappropriate conduct. These safeguards will prevent, if not eliminate, the possibility that an interaction with some future user of the website might deteriorate again.

The Ninth Circuit recently addressed an outright ban on Internet access in *LaCoste*, where the defendant pleaded guilty to conspiracy to commit securities fraud. 821 F.3d at 1187. The court vacated and remanded to the district court to "attempt to craft a more narrowly tailored condition." *Id.* at 1192. Here, as in *LaCoste*, the appropriate and more narrowly tailored condition would be to allow the Probation Office unfettered access to, and monitoring of, Mr. Sullivan's web activity.

## VIII.   Mr. Sullivan Has A First Amendment Right To Resume The Operation Of His Former Websites.

While "[t]rial courts frequently impose restrictions on speech when a criminal conviction is for crimes committed during the course of expressive activity," any such restrictions must be "narrowly drawn to protect the public from a situation that might lead to a repetition of the same crime."  *United States v. Terrigno*, 838 F.2d 371, 374 (9th Cir. 1988).  Thus, while it may be appropriate to limit a defendant's ability to incite or encourage others to break the law, it is improper to prohibit him from expressing his personal views, no matter how disturbing those views might be.  *See Porth v. Templar*, 453 F.2d 330 (10th Cir. 1971) (approving condition prohibiting defendant from inducing others through speeches to violate the law, but invalidating condition that "prohibits the expression of opinions as to invalidity or unconstitutionality" of the tax laws).

Mr. Sullivan retains his First Amendment right to freedom of expression while he is on supervised release.  It would be improper, therefore, to prohibit him from operating his former websites.  This is especially the case where other copycat websites, similar but inferior to stdcarriers.com, continue to operate today.[11]

––––––––––––––––––––

[11] There is currently at least one active website similar to the one previously operated by Mr. Sullivan.  The imitator site—STDRegistry.com—appears to mirror Mr. Sullivan's site, albeit with an inferior removal policy.  *See* STDRegistry's web page, attached hereto as Exhibit C.  It allows individuals to post not only information, but also photographs of other persons' sexually transmitted diseases. The catchphrase of the website is "Report the truth before it's too late!"  Unlike Mr. Sullivan's site, STDRegistry.com warns, "We

To the extent that the Court finds that the operation of stdcarriers.com, or any similar website, would be improper if done for profit, Mr. Sullivan requests that the Court allow him to resume the operation of his websites as a means of personal expression. *See Terrigno*, 838 F.2d at 374 (upholding restrictions on defendant profiting from speaking engagements where trial court did not restrict the defendant's "right to speak.").[12]

## IX.    CONCLUSION

Mr. Sullivan's ownership and operation of the stdcarriers.com website was not directly related to his offense of conviction. Accordingly, the Court should allow him to

---

do not remove reports, comments, posts and/or topics if you ask us directly. These will not be removed even if the statements are claimed to contain defamatory allegations. Only the submitter or an arbitration service can remove a post here." Removal Policy, STD Registry, attached hereto as Exhibit D; *see also* http://www.stdregistry.com/removal-policy (last accessed August 5, 2016). STDRegistry.com then provides links to those "arbitration services," which are actually reputation management websites that require users to pay significant sums of money to help them remove unwanted content from search results. Mr. Sullivan's website, by contrast, offers several clear methods to have information removed: (1) the person who created the post can log in and personally remove it; (2) the subject of the post can provide information, including medical records, to verify the inaccuracy of a post; or (3) the subject of the post can pay a fee to use Mr. Sullivan's reputation management web service. In addition, whereas false information was often removed from Mr. Sullivan's site, stdcarriers.com, within 30 days, STDRegistry.com warns its users that "it can take anywhere up to 6 months to 12 months or more to … remove the listing from our database." Exhibit D at 3.

[12] The Ninth Circuit has not decided "whether First Amendment concerns constrain a district judge's authority to stop a defendant from posting disparaging remarks about his victims on the internet." *LaCoste*, 821 F.3d at 1191. Unlike Mr. Sullivan, the defendant in *LaCoste* did not raise the First Amendment issue. *Id*. As the result, the court simply struck down the condition banning LaCoste from using the Internet as overbroad. *Id*. ("Even if the district court could impose a supervised release condition prohibiting such conduct here, the condition it actually imposed sweeps far more broadly.").

resume his former occupation of operating stdcarriers.com and similar web businesses. To the extent that the Court desires to avoid the possibility, however remote, that Mr. Sullivan might encounter "another A.K.," he consents to unfettered monitoring of his computer, Internet, and web activity by the U.S. Probation Office.

      RESPECTFULLY SUBMITTED this 5th day of August, 2016.

*/s/ Ruben L. Iñiguez*
Ruben L. Iñiguez
Attorney for Defendant

*/s/ Josh Ewing*
Josh Ewing
Research and Writing Assistant on brief